## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BETH WILEY and KEVIN WILEY, *Co-Trustees for the Next-of Kin of Marquisha Wiley, decedent*, CHASSITY ASHFORD, SHERRON ASHFORD, WAYNE GERMOND, NICHOLAS GUERRERO, DANIELLE HERNANDEZ, CHARISMA KYLES, JORDAN LARSON, KEESHARA PERRY, PARIS POLLARD, LATOSHA SKINNER, ESTAN TYLER, ANDREA WEATHERSBY, ERNEST WHITMORE, and KEVAUGHN WILEY, <br><br> Plaintiffs, <br><br> v. <br><br> FLEET FARM LLC, FLEET FARM GROUP LLC, FLEET FARM WHOLESALE SUPPLY CO. LLC, and TRUCK YARD – SP LLC, <br><br> Defendants. | Case No. 24-cv-4135 (LMP/JFD) <br><br><br> **ORDER GRANTING IN PART AND DENYING IN PART FLEET FARM'S MOTION TO DISMISS AND DENYING TRUCK YARD'S MOTION TO DISMISS** |

Eric Carl Arch, Paul Darsow, Peter E. Lind, and Zachary Zellner, **Tewksbury & Kerfeld, P.A., Minneapolis, MN**, Lyndsey Jorgensen and Nathan H. Bjerke, **TSR Injury Law, Bloomington, MN**, Priscilla Ann Lord and Melissa Marie Heinlein, **Lord and Heinlein, Minneapolis, MN**, for Plaintiffs.

Andrew W. Davis, Andrew Leiendecker, Todd A. Noteboom, and Zach Wright, **Stinson LLP, Minneapolis, MN**, for Defendants Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC.

Samantha Paige Flipp and Steven E. Tomsche, **Tomsche, Sonnesyn & Tomsche, P.A., Minneapolis, MN**, for Defendant Truck Yard – SP LLC.

In the early morning hours of October 10, 2021, two men—Devondre Trevon

Phillips ("Phillips") and Terry Brown ("Brown")—exchanged gunfire in a crowded bar in

St. Paul. Many patrons of the bar were caught in the crossfire and struck by stray bullets, including Plaintiffs. As a result of the shooting, Plaintiffs suffered severe injuries, and Marquisha Wiley (represented in this action by Plaintiffs Beth and Kevin Wiley) was tragically killed.

Plaintiffs now bring state-law negligence claims against Truck Yard – SP LLC ("Truck Yard") and Fleet Farm LLC, Fleet Farm Group LLC, and Fleet Farm Wholesale Supply Co. LLC (collectively, "Fleet Farm"). *See* ECF No. 1. Plaintiffs allege that Truck Yard—the owner of the bar—failed to provide adequate security for its patrons, which was a causal factor in the shooting. Plaintiffs also allege that Fleet Farm negligently sold firearms to a "straw purchaser," which allowed Phillips to obtain the gun that he would later use in the shooting at Truck Yard's bar. Fleet Farm and Truck Yard move to dismiss Plaintiffs' complaint. ECF Nos. 16, 22.

The Court first concludes that it has subject-matter jurisdiction over Plaintiffs' claims against Fleet Farm and Truck Yard. Next, the Court concludes that most of Plaintiffs' claims against Fleet Farm are not preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA"), and that the claims that are not preempted by PLCAA plausibly state a claim on which relief can be granted. Finally, the Court concludes that Plaintiffs have plausibly stated a negligence claim against Truck Yard under an "own conduct" theory of liability. Accordingly, the Court grants in part and denies in part Fleet Farm's motion to dismiss and denies Truck Yard's motion to dismiss.

## FACTUAL BACKGROUND

### Legal Framework of Firearms Regulations

A licensed firearms dealer must comply with federal and state laws regulating the commercial sales of firearms. ECF No. 1-1 ¶¶ 39–40. Before selling a firearm to a member of the public, federal law requires firearms dealers to conduct a background check, examine the buyer's identification, and record the transaction on a firearms transaction record known as ATF[1] Form 4473. *Id.* ¶ 42 (first citing 18 U.S.C. § 922(t)(1); and then citing 27 C.F.R. §§ 478.102, 478.124(a)).

Federal and state law also prohibit "straw purchases" of firearms. *Id.* ¶¶ 44–45 (first citing 18 U.S.C. § 932(b); and then citing Minn. Stat. §§ 624.7133, 624.7132, subd. 15(a)(4)). A straw purchaser is "a person who buys a gun on someone else's behalf while falsely claiming that it is for himself." *Abramski v. United States*, 573 U.S. 169, 171–72 (2014). To prevent straw purchases, the buyer of a firearm must complete ATF Form 4473, which asks the following question:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the dealer cannot transfer the firearm(s) to you.**

ECF No. 1-1 ¶ 43 (emphasis in original). The buyer must certify that the answer to this question is true, correct, and complete; it is a violation of federal law to complete ATF Form 4473 inaccurately. *Id.*

---

[1] "ATF" stands for the federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

Firearms dealers face criminal liability for selling to straw purchasers. ATF Form 4473 explains that the firearms dealer "must determine the lawfulness of the transaction and maintain proper records of the transaction." *Id.* ¶ 48. ATF Form 4473 also cites and explains 18 U.S.C. § 922(d), which criminalizes the sale of a firearm to a person "knowing or having reasonable cause to believe" that the person is prohibited from receiving or possessing a firearm. *Id.*; *see also* 18 U.S.C. § 933(a)(1) (prohibiting the sale of a firearm if the dealer "knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony"). Minnesota state law similarly criminalizes the sale of a firearm to a straw purchaser. *Id.* ¶ 50 (citing Minn. Stat. § 624.7132, subd. 15(a)(2)).

Although general firearm regulations have long been used to prosecute straw purchasing, *see, e.g.*, 18 U.S.C. § 922(a)(6), laws explicitly criminalizing straw purchasing are of recent vintage. In 2022, Congress passed, and the President signed, the Bipartisan Safer Communities Act, which squarely criminalized purchasing a firearm "on behalf of, or at the request or demand of any other person, knowing or having reasonable cause to believe that such other person" is ineligible to possess a firearm. *See* 18 U.S.C. § 932(b). A violation of Section 932(b) is a felony punishable by up to 15 years in prison, and if a person engages in a straw purchase "knowing or with reasonable cause to believe that any firearm involved will be used to commit a felony, a Federal crime of terrorism, or a drug trafficking crime," the penalty increases to 25 years in prison. *See id.* § 932(c). These penalties are stiffer than the general false-statement-to-acquire-a-firearm statute, which provides for a penalty of up to 10 years in prison. 18 U.S.C. § 924(a)(2). In enacting

Section 932(b), the House of Representatives's committee report explained that "[a]ccess to guns is a critical driver of chronic violence" and that "[t]he most frequent type of trafficking channel identified in ATF investigations is straw purchasing." H.R. Rep. No. 117-346, at 17 (2022). It further found that:

> The overwhelming majority of guns recovered in a crime start as a legal sale from a licensed dealer. Irresponsible gun dealers are the source of many crime guns, and a scourge on these communities. These dealers often willfully engage in illegal or corrupt behavior—selling guns that they know will be trafficked into areas of high crime.

*Id.* at 16–17. At the state level, Minnesota enacted a ban on straw purchasing in 1994, providing that any person who "intentionally transfers a pistol or semiautomatic military-style assault weapon" to another while knowing that the transferee is ineligible to possess a pistol is guilty of a gross misdemeanor, unless the transferee uses the weapon in a felony crime of violence within one year of the transfer, in which case the penalty for the straw purchaser becomes a felony punishable by up to one year in prison. Laws of Minnesota 1994, ch. 636, art. 3, § 41 (codified at Minn. Stat. § 624.7141 (1994)). Minnesota amended its straw purchasing ban in 2024, broadening the types of firearms to which it applies, loosening the *mens rea* requirement for prosecutors to prove, and increasing the penalties for straw purchasing. Laws of Minnesota, ch. 127, art. 36, § 3 (codified at Minn. Stat. § 624.7141 (2024)).

To help firearms dealers detect potential straw purchasers who do not otherwise admit that they are purchasing the firearm on behalf of someone else, the federal

government has compiled a list of "red flags" that often indicate a straw purchase, including:

- Multiple firearms purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;

- Multiple handgun purchases, particularly 9mm caliber handguns, as these are the most frequently recovered crime guns;

- Purchasing firearms with cash;

- The buyer is accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;

- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;

- The buyer does not keep the firearms in their residence for their own use; and

- There is a short window of time between the purchase of a firearm and the recovery of the firearm in connection with a crime.

*Id.* ¶ 46.

### *Allegations Against Fleet Farm*

Fleet Farm is a retail store chain that is federally licensed to sell firearms and ammunition to the public. *Id.* ¶¶ 38–39. Plaintiffs allege that in the five-month period from June to October 2021, Fleet Farm sold 24 firearms to Jerome Horton ("Horton"). *Id.* ¶ 55. According to Plaintiffs, there were multiple red flags that alerted or should have alerted Fleet Farm to the fact that Horton was a straw purchaser, including that: (1) on five different days, Fleet Farm sold Horton multiple firearms as part of each transaction, often handguns of the same caliber; (2) in a one-week period, Fleet Farm sold Horton eight 9mm

handguns, which ATF has determined is the most frequently recovered type of gun used in the commission of crimes; (3) Horton staggered his purchases from Fleet Farm over several days or weeks and obtained the firearms from different Fleet Farm locations in the Twin Cities; and (4) Horton used his phone to take photographs or videos of the firearms when purchasing them, ostensibly communicating with the true recipients of those firearms. *Id.* ¶¶ 56–59.

Horton was, in fact, a straw purchaser. *Id.* ¶¶ 61–62, 64. Horton transferred one of the firearms he purchased from Fleet Farm on July 31, 2021, to Gabriel Young-Duncan ("Young-Duncan"). *Id.* ¶ 62. That firearm later ended up in Phillips's hands, which he used during the shooting at Truck Yard's bar. *Id.* Both Horton and Young-Duncan later pleaded guilty to federal felony charges arising from this straw purchasing scheme. *Id.* ¶¶ 63–64.

Plaintiffs allege that Fleet Farm knew or should have known that it was selling firearms to a straw purchaser. *Id.* ¶¶ 65, 87–90. Plaintiffs assert that by selling firearms to Horton, Fleet Farm violated a variety of federal and state laws governing firearms sales. *Id.* Plaintiffs further allege that Fleet Farm aided and abetted Horton's unlicensed dealing of firearms, in further violation of federal and state law. *Id.* ¶¶ 65, 89–90, 97. Plaintiffs claim that Fleet Farm was negligent in selling firearms to Horton and that this negligence was an actual and proximate cause of Plaintiffs' injuries. *Id.* ¶¶ 92, 99. Although each of Plaintiffs' claims against Fleet Farm sound in negligence, Plaintiffs raise three distinct theories of relief: negligence, negligence per se, and negligent entrustment. *Id.* ¶¶ 85–107.

***Allegations Against Truck Yard***

Truck Yard operates a bar in downtown St. Paul which, according to Plaintiffs, "served alcohol and played loud music into the morning hours, cultivating a 'night club' like culture of late-night drinking." *Id.* ¶ 25. Plaintiffs allege that in the months leading up to the October 2021 shooting, Truck Yard advertised that there would be a DJ at the bar on weekend evenings, which regularly drew large, rowdy crowds that spilled out onto the street. *Id.* ¶¶ 27–28.

Plaintiffs allege that Truck Yard knew or should have known that this boisterous atmosphere would lead to a shooting or some other violent crime. *Id.* ¶¶ 68–69. In support of this allegation, Plaintiffs note that in the year preceding the October 2021 shooting, the St. Paul Police Department was called to Truck Yard's bar on numerous occasions to respond to violent and criminal incidents that occurred at the bar.[2] *Id.* ¶ 29. Plaintiffs also cite a YouTube video posted by Ramsey County Sheriff Bob Fletcher on October 8, 2021. *Id.* ¶ 30. In the video, Sheriff Fletcher discusses Truck Yard's bar, stating, "We've never had any shots fired here. I hope we never do, but with this volume, at some point it's going to happen, right? It's become a very popular place." *Id.* Sheriff Fletcher further states, "They have no idea how fast things can go downhill. Let me make a prediction. I think they'll go downhill before winter. When I say that, I mean fired guns." *Id.*

---

[2]    The Court observes, as does Truck Yard, that not all of the incidents listed in the St. Paul Police Department data report in the complaint appear to relate to the bar (for example, some calls for service appear related to the apartment building above the bar). ECF No. 18 at 3–4 (citing ECF No. 1-1 ¶ 29). Nonetheless, Truck Yard does not dispute that at least some (if not most) of these calls for service were for incidents at the bar.

The next evening, Sheriff Fletcher's prediction came true. In the early morning hours of October 10, 2021, a large crowd was at Truck Yard's bar while a DJ played loud music. *Id.* ¶ 34. Plaintiffs were among the crowd at Truck Yard's bar, as were Phillips and Brown. *Id.* ¶¶ 32–33. Phillips and Brown exchanged gunfire in the bar, and stray bullets from the gun fight struck and injured Plaintiffs. *Id.* ¶ 35. Phillips and Brown were later convicted in Minnesota state court for the shooting, were sentenced to 346 months and 441 months in prison, respectively, and remain incarcerated. *Id.* ¶¶ 36–37.

Plaintiffs allege that despite Truck Yard's knowledge that a shooting was reasonably likely to occur at the bar, Truck Yard negligently failed to take proper precautions to protect the bar's patrons from such a shooting. *Id.* ¶¶ 66–84. Plaintiffs fault Truck Yard for, among other things, creating a raucous atmosphere, failing to provide adequate security at the bar, failing to properly search and inspect patrons before entering the bar, failing to warn patrons of the potential danger of a shooting, and failing to ban firearms at the bar. *Id.* ¶ 74.

***Current Proceedings***

Plaintiffs brought this action in Minnesota state court, and Defendants removed the action to federal court on November 6, 2024, invoking the Court's federal-question and supplemental jurisdiction. ECF No. 1. Defendants then moved to dismiss Plaintiffs' complaint. ECF Nos. 16, 22. After a review of the filings in this case, the Court ordered supplemental briefing on whether the Court has subject-matter jurisdiction over Plaintiffs' claims against Truck Yard. *See* ECF No. 32; *see Bilello v. Kum & Go, LLC*, 374 F.3d 656, 659 (8th Cir. 2004) ("[W]hen the record indicates jurisdiction may be lacking, [the Court] must consider the jurisdictional issue sua sponte."). The parties have provided

9

supplemental briefs responding to this question, for which the Court is grateful.  *See* ECF

Nos. 36, 39, 40.

**ANALYSIS**

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ.

P. 12(b)(6), the Court must accept as true all of the factual allegations in the complaint and

draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d

787, 792 (8th Cir. 2014) (citation omitted).  The complaint must "state a claim to relief that

is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citation

omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.     Subject-Matter Jurisdiction

Because it involves a court's power to hear a case, subject-matter jurisdiction "can

never be forfeited or waived."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation

omitted).  Courts therefore have "an independent obligation to determine whether subject-

matter jurisdiction exists, even in the absence of a challenge from any party."  *Id.*  The

Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims against Fleet

Farm and Truck Yard.

### a.     Plaintiffs' Claims Against Fleet Farm

Plaintiffs bring three negligence claims against Fleet Farm that are rooted in

Minnesota common law.  ECF No. 1-1 ¶¶ 85–107.  Such state-law claims would not

ordinarily implicate the Court's federal-question jurisdiction, which exists with respect to

"all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Nonetheless, Fleet Farm argues that the Court has federal-question jurisdiction over Plaintiffs' claims against it because those claims necessarily implicate substantial questions of federal law. ECF No. 1 at 4–18. The Court agrees.

Federal jurisdiction exists "only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (internal citation omitted). However, federal-question jurisdiction may exist, even for a complaint that raises only state-law causes of action, "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 808–09 (1986) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983)). Federal-question jurisdiction is therefore properly exercised over state-law claims when a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). The Court finds that each *Gunn* requirement is met.

### i.  Necessarily Raised

"A federal issue is necessarily raised when it 'is a necessary element of one of the well-pleaded state claims' in the plaintiff's complaint." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 711 (8th Cir. 2023) (quoting *Franchise Tax Bd.*, 463 U.S. at 13). This inquiry "demands precision," and the removing defendant should be able to

point to the specific elements of the state-law claim that require proof under federal law. *Id.* (quoting *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Oper., Inc.*, 561 F.3d 904, 914 (8th Cir. 2009)).

Fleet Farm observes that the duty-of-care element of Plaintiffs' negligence claims is framed almost entirely by federal laws and regulations governing commercial sales of firearms. ECF No. 1 at 13–14. Indeed, as the complaint makes clear, determining whether Fleet Farm satisfied its duty of care will necessarily require a determination of whether Fleet Farm complied with its obligations under these multiple federal laws and regulations. *See, e.g.*, ECF No. 1-1 ¶¶ 65, 89, 97. Most significantly, the trier of fact will need to determine whether Fleet Farm knew or had reasonable cause to believe that Horton was a straw purchaser, 18 U.S.C. §§ 922(d), 933(a)(1), and whether Fleet Farm aided and abetted Horton's straw purchase and unlicensed transfer of firearms, 18 U.S.C. §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(A), 924(a)(1)(D), 924(a)(3).

Courts often find that a federal issue is "necessarily raised" when federal law governs the standard of care for a plaintiff's state-law tort claim. *See, e.g.*, *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1020–21 (2d Cir. 2014) (federal issue necessarily raised by negligence claim when the duty of care was framed by the federal Exchange Act); *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 588 (5th Cir. 2022) ("[A] negligence claim that is premised on the existence of a duty established by federal law creates a federal question."); *Carrington v. City of Tacoma, Dep't of Pub. Utils., Light Div.*, 276 F. Supp. 3d 1035, 1041 (W.D. Wash. 2017) (federal issue necessarily raised by negligence claim when the duty of care was framed by federal licensing requirements);

*New York v. Int'l Joint Comm'n*, 559 F. Supp. 3d 146, 153–54 (W.D.N.Y. 2021) (federal

issue necessarily raised by negligence claim when the duty of care was framed by federal

treaty).  The same is true here: Plaintiffs' claims, as pleaded, cannot be evaluated without

exploring the contours of federal laws and regulations governing the commercial sale of

firearms.  Simply put, Plaintiffs' negligence claims against Fleet Farm "cannot be

adjudicated without reliance on and explication of federal law."  *Wullschleger v. Royal

Canin U.S.A., Inc.*, 953 F.3d 519, 522 (8th Cir. 2020).

It is true that Plaintiffs also define Fleet Farm's duty of care by reference to

Minnesota laws regarding the sale of firearms.  *See, e.g.*, ECF No. 1-1 ¶¶ 90, 97.  But that

does not mean that a federal issue is not "necessarily raised."  The plaintiffs in *Wullschleger*

also premised their state-law claims on "violation[s] of federal *and state* law."  953 F.3d

at 522 (emphasis added).  Nonetheless, because those plaintiffs' "dependence on federal

law permeate[d]" the complaint, a federal issue was necessarily raised.  *Id.*

So too here.  Even though state laws are nominally referenced in Plaintiffs'

complaint, the gravamen of the complaint relies on a multitude of federal laws and

regulations relating to firearms sales, dealer licensing, and recordkeeping, which in turn

form the backbone of Plaintiffs' negligence claims.  *See* ECF No. 1-1 ¶¶ 39–44, 46–49,

51–54, 65, 89, 97.  Given Plaintiffs' passing reference to Minnesota law (and the apparent

lesser specificity in Minnesota firearms regulations), the Court cannot conclude that

Minnesota law "could be sufficient," by itself, to prove Plaintiffs' negligence claims against

Fleet Farm.  *Wullschleger*, 953 F.3d at 521.  Because Plaintiffs' "dependence on federal

law permeates" their complaint's allegations, a federal issue is necessarily raised.  *Id.*
at 522.

### ii.    Actually Disputed

The Court easily finds that the federal issues are actually disputed.  Fleet Farm and
Plaintiffs disagree about how federal law frames the scope of Fleet Farm's duty of care and
whether Fleet Farm satisfied any such duty of care.  Those disputes, in fact, are the "central
point of dispute."  *Gunn*, 568 U.S. at 259.

### iii.    Substantial Question

Determining whether a federal issue is "substantial" is judged not by the issue's
importance to the parties, but by "the importance of the issue to the federal system as a
whole."  *Id.* at 260.  Among other things, the Court must assess whether the federal
government has a "strong interest" in the federal issue at stake and whether allowing state
courts to resolve the issue will undermine "the development of a uniform body of [federal]
law."  *Id.* at 260–61 (citations omitted).  A federal question is more likely to be substantial
when it is a "pure issue of law," and less likely to be substantial if the issue is "fact-bound
and situation-specific" and "not likely to arise frequently."  *Iliff v. Dominium Mgmt. Servs.,
LLC*, 560 F. Supp. 3d 1276, 1282 (D. Minn. 2021) (quoting *Empire Healthchoice
Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700–01 (2006)).

Here, the federal government has a strong interest in having disputes over the scope
of federal firearms laws resolved in federal court.  The Court need look no further than the
congressional findings accompanying the enactment of federal gun-control measures, in
which Congress expressly declared that "only through adequate *Federal* control" could the

14

ills of illicit firearms trafficking be quelled.  Omnibus Crime Control and Safe Streets Act, Pub. L. 90-351, 82 Stat. 197, 225 (1968) (emphasis added).  Federal firearms regulations further emphasize the federal interest in firearms regulation by noting that gun crime is a "pervasive, *nationwide* problem" and that "[s]tates, localities, and school systems find it almost impossible to handle gun-related crime by themselves."  18 U.S.C. § 922(q)(1)(A), (H) (emphasis added).

Given the complex scheme of firearms regulations at the federal level, the federal government has a strengthened interest in resorting to the "experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  This case will eventually require a court or trier of fact to articulate the standards of conduct to which firearms dealers like Fleet Farm must conform under federal law.  As Plaintiffs' complaint makes plain, those federal-law standards are intricate, complex, and intentionally uniform across the national market for firearms.  *See* ECF No. 1-1 ¶¶ 39–44, 46–49, 51–54, 65, 89, 97; *United States v. Milheron*, 231 F. Supp. 2d 376, 379 (D. Me. 2002) ("[T]he Gun Control Act was intended to broadly regulate firearms possession and impose national uniformity in the field.") (citing *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 (1983)).  A state court's adjudication of a firearms dealer's duties under federal law will undoubtedly coax firearms dealers to conform their conduct to that interpretation, even if that interpretation is not binding on a federal court.  To maintain the federal uniformity in firearms regulations, a federal court should determine how federally licensed firearms dealers should conduct themselves under their federal-law duties.

To be sure, the issues in this case are not "pure issue[s] of law" that typify federal-question cases under *Gunn*; resolution of this case will require some evaluation of the factual circumstances surrounding Horton's firearms purchases from Fleet Farm. *McVeigh*, 547 U.S. at 700. But the Court also cannot conclude that this case presents a mere "fact-bound and situation-specific" case involving issues "not likely to arise frequently." *Iliff*, 560 F. Supp. 3d at 1282 (quoting *McVeigh*, 547 U.S. at 701). There are millions of firearm transactions every year, *see* Fed. Bureau of Investigation, *NICS Firearm Background Checks: Year by State and Type* (2024), available at https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state_type.pdf [https://perma.cc/66S2-7BMS], and the fact that the federal government publishes a list of common "red flags" for straw purchasers suggests that the factual circumstances of Fleet Farm's challenged sales arise frequently enough to establish a rule that "would govern numerous [straw purchase] cases." *McVeigh*, 547 U.S. at 700 (citation omitted). On balance, therefore, the Court concludes that the federal issues in this case are substantial to the "federal system as a whole." *Gunn*, 568 U.S. at 260.

### iv.      Disruption to the Federal-State Balance

The final *Gunn* factor ensures that "federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of" federal-question jurisdiction. *Grable*, 545 U.S. at 313–14. The "requirement is concerned with the appropriate balance of federal and state judicial responsibilities." *Gunn*, 568 U.S. at 264 (citation omitted).

16

As another court in this District recently recognized in finding federal-question jurisdiction over similar claims against Fleet Farm:

> Commercial firearms are predominantly regulated at the federal level. As the Complaint makes clear, firearm dealers must be federally licensed, are directly regulated by the ATF, and receive the majority of their training and guidance from federal sources. Therefore, Fleet Farm's duties are largely established at the federal level—not by the state. The central issue in this litigation will be the contours of those federal regulations and duties, rather than the contours of state law. In fact, once the federal issues are resolved, the application of state law should be relatively straightforward. Therefore, the Court may resolve the central issues in this case without disturbing the federal-state balance.

*Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 839 (D. Minn. 2023) (Tunheim, J.). Judge Tunheim's analysis is persuasive. Congress would ordinarily expect a federal court to hear a case that centers on interpreting federal duties established by Congress for federally licensed firearms dealers. Because this Court's exercise of federal-question jurisdiction is consistent with that congressional judgment, the Court finds that it has subject-matter jurisdiction over Plaintiffs' claims against Fleet Farm. *See Grable*, 545 U.S. at 313–14.

### b. Plaintiffs' Claim Against Truck Yard

Plaintiffs assert a single negligence claim against Truck Yard. ECF No. 1-1 ¶¶ 66–84. But unlike the negligence claims against Fleet Farm, the negligence claim against Truck Yard does not implicate any federal laws or standards. The parties have not argued that federal-question jurisdiction exists for this claim, and the Court agrees with that

17

conclusion.  So, if the claim against Truck Yard is to remain in federal court, it must fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.[3]

The exercise of supplemental jurisdiction entails a two-part test.  First, the Court must decide whether it *can* exercise supplemental jurisdiction.  *Hunter v. Page County*, 102 F.4th 853, 869 (8th Cir. 2024).  Second, the Court considers whether it *should*, in its discretion, exercise supplemental jurisdiction.  *Id.*

### i.    Whether the Court Can Exercise Supplemental Jurisdiction[4]

A federal court can exercise supplemental jurisdiction over state-law claims if the federal and state-law claims "derive from a common nucleus of operative fact," such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  In determining whether state and federal claims arise from a "common nucleus of operative fact," the Court asks whether the party asserting the claims "would ordinarily be expected to try them all in one judicial proceeding."  *Id.*  A more concrete formulation of the test, embraced by courts in this District, asks "whether there is, at minimum, a discernable overlap between the

---

[3]    In passing, Truck Yard argues that diversity jurisdiction also exists because there is diversity of citizenship between all Plaintiffs and all Defendants.  ECF No. 40 at 4–6. When subject-matter jurisdiction is challenged, "the burden falls upon the party seeking the federal forum . . . to demonstrate by a preponderance of the evidence that the parties are citizens of different states."  *Sheehan v. Gustafson*, 967 F.2d 1214, 1215 (8th Cir. 1992). Here, Truck Yard offers no actual evidence (whether by declaration or exhibit) of its citizenship.  The Court therefore relies on supplemental jurisdiction, not diversity jurisdiction, to evaluate jurisdiction over the claim against Truck Yard.

[4]    In their supplemental briefing, Plaintiffs, Fleet Farm, and Truck Yard are in agreement that the Court has supplemental jurisdiction over Plaintiffs' claims against Truck Yard.  *See* ECF No. 36 at 3–8, ECF No. 39 at 2–12, ECF No. 40 at 2–4.

18

operative facts underlying the federal claims and those underlying the appended state claims." *Sacks v. Univ. of Minn.*, 600 F. Supp. 3d 915, 933 (D. Minn. 2022) (quoting *Hunt v. Up N. Plastics, Inc.*, 980 F. Supp. 1042, 1044 (D. Minn. 1997)) (collecting cases).

In one sense, there is little discernable overlap between the federal claims against Fleet Farm and the state-law claim against Truck Yard: the facts relevant to Fleet Farm's potential liability (specifically, whether Fleet Farm knowingly sold a firearm to a straw purchaser) have little to do with the facts relevant to Truck Yard's potential liability (specifically, whether Truck Yard had sufficient security at its bar). Arguing in support of supplemental jurisdiction, Plaintiffs and Truck Yard summarily assert that the claims are linked by the shooting at Truck Yard's bar. ECF No. 36 at 4; ECF No. 40 at 3. That factual observation is true enough, but Plaintiffs and Truck Yard do not explain why a single, shared fact between the claims compels the legal conclusion that supplemental jurisdiction is warranted. *See Pecore v. Jennie-O Turkey Store, Inc.*, 990 F. Supp. 2d 984, 990 (D. Minn. 2014) (no common nucleus of operative fact when only two facts connected the state and federal claims).

However, Fleet Farm argues that "claims share a common nucleus of operative fact where co-defendants allegedly committed different negligent acts, but their separate acts purportedly caused the same harm." ECF No. 39 at 6. This principle often emerges in personal-injury cases in which an initial tortfeasor causes injury to a plaintiff and, later, negligence by another party contributes to or aggravates that same injury. *See Lewis v. Cimarron Valley R.R.*, 162 F. Supp. 2d 1220, 1224–26 (D. Kan. 2001) (supplemental jurisdiction properly exercised over federal claims against employer for injuries obtained

19

at work and state medical malpractice claim against surgeon for later contributing to that same injury); *Mueller v. Long Island R.R. Co.*, No. 89 Civ. 7384(CSH), 1997 WL 189123, at *2–4 (S.D.N.Y. Apr. 17, 1997) (same).  In such cases, when "several causes combine" to create a single, indivisible injury, "supplemental jurisdiction is properly exercised." *Urban v. King*, 783 F. Supp. 560, 563 (D. Kan. 1992); *see also Est. of Reed ex rel. Reed v. United States*, No. 05-5066-CV-SW-FJG, 2006 WL 2043100, at *2 (W.D. Mo. July 20, 2006); *Williams v. Bd. of Regents of Univ. of N.M.*, 990 F. Supp. 2d 1121, 1148 (D.N.M. 2014).

As an illustrative example, the Fifth Circuit examined a case in which the plaintiff suffered a back injury while working on a ship off the coast of Nigeria.  *Fiegler v. Tidex Inc.*, 826 F.2d 1435, 1436 (5th Cir. 1987).  When the plaintiff returned to New Orleans, he was struck by a car, which contributed further to his back injury.  *Id.* at 1437.  The plaintiff sued his employer (under federal law) and the car's driver (under state law) in the same action to recover damages for his back injury.  *Id.*  The Fifth Circuit held that supplemental jurisdiction was properly exercised over the state-law claim against the driver, reasoning that "[a]lthough the two accidents were geographically distant, one off the coast of Nigeria and the other in the New Orleans area, the injury claims overlap."  *Id.* at 1439.  The Fifth Circuit explained that the plaintiff "presented only one complaint" seeking "recovery for injury to his back," and noted that "[t]he extent of the injury resulting from the accident in New Orleans could not be determined without a concomitant decision about the extent of the injury from the fall on the rig."  *Id.*

Similarly, in *Zuchowski v. Alpena Public Schools*, the parent of a teenager who died by suicide brought a *Monell* and Section 1983 claim against the teenager's school and guidance counselor, respectively, alleging that they were indifferent to the teenager's mental health issues. No. 17-cv-13345, 2018 WL 1947277, at *2 (E.D. Mich. Apr. 25, 2018). In the same action, the parent brought a state-law negligence claim against the teenager's landlord, alleging that the landlord had negligently installed and maintained a swing which the teenager had used to commit suicide. *Id.*

The landlord argued that supplemental jurisdiction did not extend to the state-law negligence claim against it. *Id.* at *4. The court disagreed, explaining that "[d]espite the obvious distinctions between the different legal claims, each arise from the same common nucleus of fact," with the "most prominent thread between the claims [being], of course, the underlying injury: [the teenager's] death." *Id.* at *5. The court also noted that the plaintiff alleged that all defendants proximately caused her daughter's death by suicide, and if the claims were not tried together, "each jury would arguably be presented with an incomplete representation of the potential factors leading to [the teenager's] death." *Id.* The court consequently concluded that "these claims are of the sort which a plaintiff would be expected to try together." *Id.*

The reasoning of these personal-injury cases readily applies to this case. To be sure, there are "obvious distinctions between the different legal claims" against Fleet Farm and Truck Yard. *Id.* And like in *Fiegler*, the events occurring at Fleet Farm and Truck Yard differ in time, space, and motivation. 826 F.2d at 1439. But notwithstanding these factual distinctions, Plaintiffs allege that Fleet Farm and Truck Yard engaged in conduct that

culminated in a single, indivisible harm: Plaintiffs' injuries from the shooting. *See* ECF No. 1-1 ¶ 84 (alleging that Truck Yard's negligence was the cause of Plaintiffs' "personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY"); *id.* ¶¶ 92, 99 (alleging that Fleet Farm's negligence was the cause of those same injuries). And Plaintiffs have framed their theory of the case similarly, explaining that this harm "arises from the collective behavior of defendants which . . . culminated in a devastating gunfight." ECF No. 36 at 5.

Because Plaintiffs allege that Fleet Farm's and Truck Yard's conduct combined to create a single, indivisible injury, the Court is persuaded that these claims "would ordinarily be expected to [be tried] all in one judicial proceeding." *Gibbs*, 383 U.S. at 725. Like in *Zuchowski* and *Fiegler*, Plaintiffs will be required to explain how the conduct of two different actors proximately caused the same injury. If Truck Yard's claims were remanded to state court, the state and federal juries—each considering only the actions of one of the defendants—"would arguably be presented with an incomplete representation of the potential factors leading to [the shooting]." *Zuchowski*, 2018 WL 1947277, at *5. Because the federal and state claims present a "discernable overlap" in the facts relevant to the single, indivisible injury suffered by Plaintiffs, supplemental jurisdiction over Plaintiffs' claims against Truck Yard is appropriate. *Sacks*, 600 F. Supp. 3d at 933.

### ii.    Whether the Court Should Exercise Supplemental Jurisdiction

Just because the Court *can* exercise supplemental jurisdiction does not mean it *should*. Because the exercise of supplemental jurisdiction is discretionary, *Hunter*, 102 F.4th at 869, the second part of the supplemental-jurisdiction test asks the Court to consider

the "four factors enumerated in the federal supplemental-jurisdiction statute," *Wong v. Minn. Dep't of Hum. Servs.*, 820 F.3d 922, 933 (8th Cir. 2016). Those four factors are: (1) whether the state-law claim "raises a novel or complex issue of State law"; (2) whether the state claim "substantially predominates" over federal claims; (3) whether "the district court has dismissed all claims over which it has original jurisdiction"; and (4) whether "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

### 1.    Novel or Complex Issue of State Law

Truck Yard asserts in its supplemental briefing on jurisdiction that Plaintiffs' claim does not raise a novel or complex issue of state law. ECF No. 40 at 3. But that argument contradicts Truck Yard's motion-to-dismiss briefing, which contends that Plaintiffs are asking this Court to recognize a novel "negligent security" cause of action under Minnesota law. ECF No. 18 at 12–16. The Court agrees that whether the Minnesota Supreme Court would recognize a claim for "negligent security" is unsettled under Minnesota law. *See Minks v. Cherry*, No. A06-1166, 2007 WL 1053501, at *4 (Minn. Ct. App. Apr. 10, 2007) (noting that the Minnesota Supreme Court has not adopted a negligent security cause of action). Given this novel, disputed issue of state law, the Court would ordinarily be inclined to remand Plaintiffs' claim against Truck Yard to state court so that the courts of Minnesota can determine, in the first instance, whether such a cause of action exists.

However, Plaintiffs have maintained in their motion-to-dismiss briefing that they are *not* asserting a negligent security claim but are instead relying on well-established theories of negligence liability under state law. ECF No. 33 at 16 ("Plaintiffs' Complaint

23

states a claim for negligent performance of a voluntarily assumed duty, not for 'negligent security.'"). The Court accepts Plaintiffs' interpretation of their complaint, as Plaintiffs are "master to decide what law [they] will rely upon." *First Nat'l Bank of Aberdeen v. Aberdeen Nat'l Bank*, 627 F.2d 843, 850 (8th Cir. 1980) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)). The Court agrees that the theories of liability pleaded by Plaintiffs against Truck Yard implicate well-established principles of state negligence law. Accordingly, this factor does not weigh in favor of remanding this case.

### 2.    Whether State Claims Substantially Predominate

The Court does not believe that the state negligence claim against Truck Yard "substantially predominates" over the federal claims against Fleet Farm. In terms of the raw number of causes of actions alleged, Plaintiffs bring more claims implicating federal law (three) than pure state-law claims (one). *See Hunter*, 102 F.4th at 871 (considering whether state claims "outnumbered" federal claims). Moreover, the Court estimates that the quantum of evidence required to prove the federal and state claims will be approximately equal (to the extent that evidence does not overlap for both claims, which will likely be the case). *See Gibbs*, 383 U.S. at 726 (considering whether state claims predominate over federal claims "in terms of proof"). This factor does not weigh in favor of remanding this case.

24

### 3. Dismissal of All Claims Invoking the Court's Original Jurisdiction

As further described below, the Court will not dismiss all claims against Fleet Farm that are subject to the Court's original jurisdiction, so this factor does not weigh in favor of remanding this case.

### 4. Compelling Reasons for Declining Jurisdiction

Under the fourth factor, the Court considers the underlying interests in exercising supplemental jurisdiction: comity, fairness, judicial economy, and convenience. *Hunter*, 102 F.4th at 872. Here, judicial economy, convenience, and fairness are furthered by keeping Plaintiffs' claims against Fleet Farm and Truck Yard together in one action. As Plaintiffs explain, remanding their claim against Truck Yard to state court would lead to "a doubling up of what could be dozens of depositions relating to the overlap[ping] facts of the shooting itself, two depositions of every plaintiff and their damages witnesses, including experts, [and] a doubling up of expert reports and expenses." ECF No. 36 at 7. And, if this case proceeds to trial, there is a risk that separate trials would lead to "inconsistent verdicts or allocations of fault." ECF No. 39 at 11. Of course, there will be discovery unique to each defendant's liability, but the parties persuasively argue that separate trials will, on balance, lead to "double the work and expense"—both for the parties and the judicial system. ECF No. 36 at 7. These considerations counsel against declining supplemental jurisdiction. *See Abdel-Ghani v. Target Corp.*, No. 14-cv-3644 (PJS/JJK), 2015 WL 1292568, at *6 (D. Minn. Mar. 23, 2015) (exercising supplemental jurisdiction

and noting that judicial economy is furthered by avoiding redundant discovery);
*Zuchowski*, 2018 WL 1947277, at *5–6.

The Court will therefore exercise supplemental jurisdiction over Plaintiffs' claim
against Truck Yard.

## II.    Merits of Plaintiffs' Claims Against Fleet Farm

Having assured itself of its jurisdiction over Plaintiffs' claims, the Court now
considers the merits of those claims, starting with the claims against Fleet Farm.  Fleet
Farm asserts that Plaintiffs' negligence and negligent entrustment claims are preempted by
PLCAA[5] and, even if those claims are not preempted, Plaintiffs' allegations fail to plausibly
state a claim to relief.  ECF No. 24 at 7–29.  The Court addresses each argument in turn.

### a.    PLCAA Preemption

Enacted in 2005, PLCAA generally preempts claims against firearms dealers "for
the harm solely caused by the criminal or unlawful misuse of firearm products or
ammunition products by others when the product functioned as designed and intended."
15 U.S.C. § 7901(b)(1).  Specifically, PLCAA immunizes firearms dealers from such
claims by mandating that a "qualified civil liability action may not be brought in any
Federal or State court."  *Id.* § 7902(a).  A qualified civil action is:

> [A] civil action or proceeding or an administrative proceeding
> brought by any person against a manufacturer or seller of a
> [firearm], or trade association, for damages, punitive damages,
> injunctive or declaratory relief, abatement, restitution, fines, or

---

[5]    Fleet Farm does not assert that Plaintiffs' negligence per se claim is preempted by
PLCAA.

penalties, or other relief, resulting from the criminal or
unlawful misuse of a [firearm] by the person or a third party.

*Id.* § 7903(5)(A).

Although PLCAA's preemptive force is broad, it is not absolute.  Indeed, Congress

saw fit to provide six exceptions to the definition of a "qualified civil action," two of which

are relevant here.  First, "an action brought against a seller for negligent entrustment or

negligence per se" is not preempted by PLCAA.  *Id.* § 7903(5)(A)(ii).  Second, an action

is not preempted by PLCAA if it alleges that a "seller of a qualified product knowingly

violated a State or Federal statute applicable to the sale or marketing of the product, and

the violation was a proximate cause of the harm for which relief is sought."  *Id.*

§ 7903(5)(A)(iii).  This second exception—known as the "predicate exception"—requires

a plaintiff not only to "present a cognizable claim," but also to "allege a knowing violation

of a predicate statute."  *Fleet Farm LLC*, 679 F. Supp. 3d at 840 (citation omitted) (internal

quotation marks omitted).  That predicate statute "must regulate the firearms industry

specifically."  *Id.*; *see Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S.

280, 286 (2025) (describing a predicate violation as a violation of a "firearms offense").

Plaintiffs assert three claims against Fleet Farm: negligence, negligence per se, and

negligent entrustment.  ECF No. 1-1 ¶¶ 85–107.  A threshold issue disputed by the parties

is whether PLCAA preemption is analyzed claim-by-claim or whether it is analyzed action-

wide.  *See* ECF No. 24 at 18; ECF No. 34 at 18–19.  Under the claim-specific framework

adopted by some courts, each cause of action against Fleet Farm must satisfy an exception

to PLCAA preemption.  *See, e.g.*, *Doyle v. Combined Sys., Inc.*, No. 3:22-CV-01536-K,

2023 WL 5945857, at *6 (N.D. Tex. Sept. 11, 2023); *Parsons v. Colt's Mfg. Co.*, No. 2:19-cv-1189-APG-EJY, 2020 WL 1821306, at *3–6 (D. Nev. Apr. 10, 2020); *New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 329–34 (S.D.N.Y. 2024).  Conversely, under the action-wide framework adopted by other courts, if even one claim satisfies an exception to PLCAA preemption, then the rest of the claims will be deemed not to be preempted.  *See, e.g.*, *Fleet Farm LLC*, 679 F. Supp. 3d at 840–41; *Corporan v. Wal-Mart Stores E., LP*, No. 16-2305-JWL, 2016 WL 3881341, at *4 n.4 (D. Kan. July 18, 2016); *Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 151 (N.Y. App. Div. 2012); *see also Ramos v. Wal-Mart Stores, Inc.*, 202 F. Supp. 3d 457, 464–66 (E.D. Pa. 2016) (describing the split in authority).

The Court concludes that the claim-specific framework best accords with the statutory text and PLCAA's purpose.  Proponents of the action-wide framework observe that PLCAA preempts an "action," 15 U.S.C. § 7903(5)(A), which is often understood to refer to the entire lawsuit, *see Ramos*, 202 F. Supp. 3d at 464–65.  But that conclusion is not airtight: although the term "action" can refer to the entire suit, *see* Fed. R. Civ. P. 2 ("There is one form of action—the civil action."), it can also be used as a shorthand to refer to a *cause of action*, *see Action*, Black's Law Dictionary (12th ed. 2024) (including various causes of action under the definition of action, including "action for money had and received," "action of ejectment," and "action for mesne profits"); Minn. Stat. § 573.02, subd. 1 (referring to a wrongful-death cause of action as a "death action").

The latter definition of "action" makes better sense in the context of PLCAA's text and purpose.  The object of statutory interpretation is "to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must

28

ordinarily be regarded as conclusive." *Negonsott v. Samuels*, 507 U.S. 99, 104 (1993) (citation omitted). "The best evidence of [statutory] purpose is the statutory text adopted by both Houses of Congress and submitted to the President." *Citicasters v. McCaskill*, 89 F.3d 1350, 1354 (8th Cir. 1996) (alternation in original) (quoting *W. Va. Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 98–99 (1991)). Within PLCAA itself, Congress identified one of the purposes of the law as "prohibit[ing] *causes of action*" that would run afoul of PLCAA's substantive preemption. 15 U.S.C. § 7901(b)(1) (emphasis added). And when PLCAA enumerates "actions" that are exempted from the statute's preemptive sweep, it speaks in *causes of action*, such as "negligent entrustment," "negligence per se," "breach of contract," and "[breach of] warranty." *Id.* § 7903(5)(A)(ii), (iv). And as an interpretative cherry-on-top, PLCAA's statutory rule of construction indicates that nothing in the statute "shall be construed to create a public or private cause of action or remedy." *Id.* § 7903(5)(C).

All of this textual evidence suggests that Congress would not permit claim-smuggling by which a plaintiff's "decision to join all of his or her claims in a single lawsuit . . . rescue[s] claims that would have been doomed . . . if they had been asserted in a separate action." *Doyle*, 2023 WL 5945857, at *6 (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007)). Claim-smuggling would allow a cause of action that Congress intended to preempt, in violation of PLCAA's rule of construction. 15 U.S.C. § 7903(5)(C). The Court will therefore analyze whether Plaintiffs' negligence and negligent entrustment claims against Fleet Farm are preempted by PLCAA, along with

29

Plaintiffs' aiding-and-abetting theory of liability, which underlies Plaintiffs' claims against Fleet Farm.

### i.    Negligence (Count II)

While Plaintiffs assert that their negligence claim falls within the predicate exception to PLCAA preemption, ECF No. 34 at 15–18, Fleet Farm argues that the negligence claim is preempted because Plaintiffs do not assert a knowing violation of a federal or state law as required under the predicate exception, ECF No. 24 at 9–11. To satisfy the predicate exception, Plaintiffs must allege that Fleet Farm knowingly violated a statute that "regulate[s] the firearms industry specifically," and that the violation was the proximate cause of Plaintiffs' injuries. *Fleet Farm LLC*, 679 F. Supp. 3d at 840.

Plaintiffs have done this. Plaintiffs allege that Fleet Farm knowingly violated federal and state laws that prohibit firearms dealers from selling to straw purchasers—laws that unquestionably regulate the firearms industry specifically. ECF No. 1-1 ¶¶ 65, 87–90. Plaintiffs offer further support for Fleet Farm's *mens rea* by alleging "red flags" that purportedly "put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms." *Id.* ¶¶ 46, 56–60. Although Fleet Farm argues that Plaintiffs have not alleged actual knowledge on Fleet Farm's part, knowledge may be, and generally is, "established through circumstantial evidence." *United States v. Benitez*, 531 F.3d 711, 716 (8th Cir. 2008). Here, Plaintiffs allege numerous warning signs that purportedly alerted Fleet Farm to Horton's straw purchasing, including Horton's numerous, staggered purchases of multiple firearms (often of the same 9mm caliber) from various Fleet Farm locations across the Twin Cities, and his practice of taking photographs or

30

videos of the firearms when purchasing them.  ECF No. 1-1 ¶¶ 56–59.  These "red flags" offer plausible circumstantial evidence, at least at the pleading stage, that Fleet Farm knew it was violating federal firearms regulations by selling to a straw purchaser.  Finally, Plaintiffs allege that Fleet Farm's sale of firearms to Horton was a proximate cause of their injuries—an allegation which, as discussed below, is adequately pleaded.  *Id.* ¶ 92. Construed in the light most favorable to Plaintiffs, *Gorog*, 760 F.3d at 792, Plaintiffs have established each requirement of the predicate exception.

Fleet Farm also appears to argue that simple common-law negligence claims are categorically preempted under PLCAA.  ECF No. 24 at 9–10.  Nothing in PLCAA's text compels that conclusion; rather, PLCAA permits "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. § 7903(5)(A)(iii).  It is not for this Court to graft Fleet Farm's preferred limitation onto the predicate exception "by inserting language that Congress has opted to omit."  *SEC v. Zahareas*, 272 F.3d 1102, 1106–07 (8th Cir. 2001) (citation omitted).  And when courts have found simple negligence claims preempted by PLCAA, the claim was often premised on violations of common-law duties.  *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1132–33 (9th Cir. 2009); *Jefferies v. District of Columbia*, 916 F. Supp. 2d 42, 43, 46–47 (D.D.C. 2013); *Fleet Farm LLC*, 679 F. Supp. 3d at 841.  Here,

Plaintiffs have alleged more: violations of applicable predicate statutes, which brings Plaintiffs' negligence claim squarely within the ambit of the predicate exception.

If there was any doubt about whether Congress intended to allow simple negligence claims to proceed under the predicate exception, the contemporaneous legislative history dispels that doubt. During debates on PLCAA, multiple supporters of the law suggested that simple negligence claims could proceed under the predicate exception.[6] For example, Senator Lindsey Graham, a co-sponsor of PLCAA, explained during a debate over the bill that a firearms dealer is "on the hook, and can be held accountable based on a *simple negligence theory* or a negligence per se theory, if [it] violate[s] a specific statute during the sale of a gun." 151 Cong. Rec. S9226 (2005). And Senator Larry Craig, the law's primary sponsor, explained plainly, "If a gun dealer or manufacturer violates the law, this bill is not going to protect them from a lawsuit brought against them for harm resulting from that misconduct." 151 Cong. Rec. S9089 (2005). Simply put, regardless of the underlying cause of action brought by the plaintiff, PLCAA does not shield a firearms dealer from liability if a plaintiff plausibly alleges knowing violations of applicable predicate statutes. Plaintiffs have done so here, so their negligence claim is not preempted.

---

[6] Although statements by individual legislators "should not be given controlling effect," they do "provide evidence of Congress' intent" when "they are consistent with the statutory language and other legislative history." *Brock v. Pierce County*, 476 U.S. 253, 263 (1986). The statements of PLCAA's supporters align with the statute's plain text and therefore provides additional, probative evidence of Congress's intent.

### ii.    Negligent Entrustment (Count IV)

Fleet Farm next argues that Plaintiffs' negligent entrustment claim is preempted by PLCAA.  ECF No. 24 at 11–12.  As noted above, PLCAA does not preempt a plaintiff's claim of "negligent entrustment," but only when that claim falls within PLCAA's specific definition of negligent entrustment: "the supplying of a [firearm] by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."  15 U.S.C. § 7903(5)(B).

The parties' dispute revolves around the word "use" in this definition.  Fleet Farm interprets the word "use" narrowly, such that negligent entrustment claims are not preempted only if the seller provides a firearm to a person who actually uses it in a shooting.  ECF No. 24 at 11–12.  Plaintiffs argue that an actionable "use" under this definition may also occur when a straw purchaser transfers the firearm to another person who uses the firearm in a shooting.  ECF No. 34 at 20.

"[T]he word 'use' poses some interpretational difficulties because of the different meanings attributable to it."  *Dubin v. United States*, 599 U.S. 110, 118 (2023) (citation omitted).  The "ordinary or natural meaning" of "use" is "variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'"  *Id.* (alteration in original) (citation omitted) (internal quotation marks

omitted).  Ultimately, however, the word "use" takes on "different meanings depending on context" given the word's elasticity.  *Id.* (citation omitted).

The phrase "use the product in a manner involving unreasonable risk of physical injury to the person or others" is ambiguous in this context because both Fleet Farm and Plaintiffs offer reasonable interpretations of the statute.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 863 (8th Cir. 2011).  Obviously, a person who uses a firearm in a shooting "uses" a firearm "in a manner involving unreasonable risk of physical injury to . . . others," 15 U.S.C. § 7903(5)(B), so Fleet Farm's proposed interpretation is clearly reasonable.  But "using" a firearm by transferring it from a straw purchaser to another individual may also "involv[e] unreasonable risk of physical injury to . . . others"; indeed, Congress regulates straw purchasing and the unlicensed distribution of firearms precisely because "the ease with which any person can acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States." Omnibus Crime Control and Safe Streets Act, Pub. L. 90-351, 82 Stat. 197, 225 (1968).  Indeed, the ATF has identified straw purchasing as the most common trafficking channel for "crime guns."  *See* H.R. Rep. No. 117-346, at 17 (2022).

Given this ambiguity, the Court "may examine legislative history and other authorities to determine legislative intent" behind the provision.  *Est. of Farnam ex rel. Farnam v. Comm'r of Internal Revenue*, 583 F.3d 581, 584 (8th Cir. 2009) (citing *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987)).  Committee reports often "represent the most persuasive indicia of congressional intent."  *Weber v. Heaney*, 793 F. Supp. 1438, 1448 (D. Minn. 1992) (citing *Hous. Auth. of Omaha v. U.S.*

*Hous. Auth.*, 468 F.2d 1, 6–7 n.7 (8th Cir. 1972)).    In this case, the House of

Representatives's committee report for PLCAA included a lengthy statement from the

dissenting committee members, who took issue with PLCAA's definition of "negligent

entrustment." H.R. Rep. No. 109-124, at 139–51 (2005).  The dissenting members believed

that the definition of "negligent entrustment" would "shut" the "courthouse door" to

victims of shootings with firearms supplied by a "straw buyer." *Id.* at 143.  The dissenting

members concluded: "Even though the dealer who irresponsibly supplied the gun trafficker

with multiple guns should have known the guns would be sold to and used by criminals,

they arguably did not 'negligently entrust' the guns since the persons to whom they sold

the guns did not commit the underlying criminal acts." *Id.* at 144.

It does not appear that supporters of PLCAA ever responded to the dissenting

members' concerns about the definition of negligent entrustment—in fact, such concerns

were dismissed during a House Judiciary Committee hearing on the bill.  *Protection of*

*Lawful Commerce in Arms Act: Hearing on H.R. 800 Before the H. Comm. on the*

*Judiciary*, 109th Cong. 46 (2005) (statement of Rep. Louis Gohmert).  Given Congress's

awareness of and "failure to heed" the objection of PLCAA's opponents, it appears that

Congress's intent was to preempt negligent entrustment actions *unless* a dealer sold a

firearm to a person who directly used the firearm in a shooting.  *See Booth v. Churner*, 206

F.3d 289, 299 n.9 (3d Cir. 2000) (interpreting a statute by looking to Congress's awareness

of and "failure to heed" the objection of the bill's opponents); *see also* George A. Costello,

*Average Voting Members and Other "Benign Fictions": The Reliability of Committee*

*Reports, Floor Debates, and Other Sources of Legislative History*, 1990 Duke L.J. 39, 45

("[M]inority or dissenting views appended to committee reports can be useful . . . to establish that there was focused debate on a position advocated by opponents, but rejected by the committee.").

Accordingly, the Court concludes that the word "use" in 15 U.S.C. § 7903(5)(B) does not encompass the transfer of a firearm from a straw purchaser to another individual but refers only to direct use of a gun in a shooting or other violent crime.  Because it is undisputed that Horton—the person to whom Fleet Farm sold firearms—did not commit the shooting at Truck Yard's bar, Plaintiffs' negligent entrustment claim is preempted.  The Court therefore dismisses Count IV of Plaintiffs' complaint.

### iii.     Aiding and Abetting Liability

Plaintiffs premise their negligence and negligence per se claims, in part, on the theory that Fleet Farm aided and abetted Horton in his unlicensed distribution of firearms.  ECF No. 1-1 ¶ 65, 88–89, 97.  Although Plaintiffs argue that such claims fall within the predicate exception, ECF No. 34 at 17–18, Fleet Farm asserts that such claims are preempted by PLCAA, ECF No. 24 at 12–13.

Fleet Farm observes that the predicate exception does not preempt actions:

> including—[A]ny case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the

> qualified product was prohibited from possessing or receiving
> a firearm or ammunition under subsection (g) or (n) of section
> 922 of Title 18.

15 U.S.C. § 7903(5)(A)(iii).  Fleet Farm's primary argument is that because Plaintiffs do not bring their aiding-and-abetting theories pursuant to the theories explicitly enumerated in the predicate exception, Plaintiffs' theory is necessarily excluded from the exception. ECF No. 24 at 12–13.  The U.S. Supreme Court tacitly rejected that interpretation of the predicate exception in *Smith & Wesson*, explaining that "the predicate violation PLCAA demands may come from aiding and abetting someone else's firearms offense."  605 U.S. at 286.  The Supreme Court further noted that the "predicate exception itself lists as *examples* two ways in which aiding and abetting qualifies," but observed that "more broadly, aiding and abetting can qualify as a PLCAA predicate violation by virtue of another law assimilating an accomplice's liability to a principal's."  *Id.* (emphasis added). Therefore, the Supreme Court understood the predicate exception to list only non-exhaustive examples of aiding-and-abetting liability, while accepting that aiding-and-abetting liability can supply a predicate violation more expansively with "another law assimilating an accomplice's liability to a principal's."  *Id.*

From first principles of statutory interpretation, that is the correct result.  Fleet Farm essentially relies on the interpretative canon *expressio unius est exclusio alterius*: the expression of one item of an associated series necessarily excludes another item that is unmentioned.  *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017).  The problem for Fleet Farm is that this canon of interpretation is overcome by "contrary indications that

adopting a particular rule or statute was probably not meant to signal any exclusion." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (citation omitted).

Here, the predicate exception contains the critical word "including" before referring to specific forms of aiding-and-abetting liability.  15 U.S.C. § 7903(5)(A)(iii).  Use of the word "including" in the statute's text "connotes simply an illustrative application," *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941), and reveals Congress's intent not "to signal any exclusion" by providing illustrative examples of predicate offenses, *Marx*, 568 U.S. at 381 (citation omitted); *see Hennepin County v. Fed. Nat'l Mortg. Ass'n*, 933 F. Supp. 2d 1173, 1176 n.4 (D. Minn. 2013) (rejecting *expressio unius* canon when a statute used the qualifier "including").  Fleet Farm's interpretation of the predicate exception is unduly narrow and must be rejected.

Fleet Farm's alternative argument is that Plaintiffs' aiding-and-abetting allegations cannot survive after the Supreme Court's decision in *Smith & Wesson*.  ECF No. 49.  *Smith & Wesson* indeed provides the roadmap to evaluate whether Plaintiffs' aiding-and-abetting theory satisfies the predicate exception, so the Court will examine that case in depth.[7]

In *Smith & Wesson*, the Mexican government brought suit against seven gun manufacturers, alleging that the manufacturers "aided and abetted unlawful sales" of firearms by "fail[ing] to exercise 'reasonable care' to prevent trafficking of their guns into

---

[7]    The Supreme Court decided *Smith & Wesson* after oral argument on Defendants' motions.  After the opinion issued, the Court solicited supplemental briefing from Plaintiffs and Fleet Farm regarding *Smith & Wesson*'s impact on Plaintiffs' aiding-and-abetting theory of liability.  ECF No. 47.  Both Plaintiffs and Fleet Farm provided that briefing.  ECF Nos. 48, 49.

Mexico." 605 U.S. at 285. Relevant here, Mexico alleged that the "manufacturers supply firearms to retail dealers whom they know illegally sell to Mexican gun traffickers." *Id.* at 288. Those manufacturers used a three-tier distribution system: manufacturers sell to wholesale distributors, who sell to retail dealers, who sell to customers. *Id.* at 288–89. Mexico alleged that the manufacturers sell to "bad apple" retail dealers who frequently violate federal firearms regulations, so by "choosing not to cut off the flow of firearms to the known rogue dealers," the manufacturers aid and abet the dealers' illegal sales of firearms. *Id.* at 289.

The Supreme Court explained that "[t]o aid and abet a crime, a person must 'take an affirmative act in furtherance of that offense'" and "intend to facilitate the offense's commission." *Id.* at 291 (cleaned up) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)). The Supreme Court further articulated "several ancillary principles" relevant to aiding-and-abetting liability. *Id.* at 292. First, aiding and abetting is most commonly "a rule of secondary liability for specific wrongful acts," not for a "broad category of misconduct." *Id.* (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 494 (2023)). Second, aiding and abetting usually requires "misfeasance rather than nonfeasance." *Id.* And third, "routine and general activity that happens on occasion to assist in a crime—in essence, 'incidentally'—is unlikely to count as aiding and abetting." *Id.* (quoting *Rosemond*, 572 U.S. at 77 n.8). Therefore, an "ordinary merchant" does not become liable for all criminal misuse of his goods, "even if he knows that in some fraction of cases misuse will occur." *Id.* (citation omitted).

The Supreme Court then compared two of its prior cases: "one approving liability for aiding another's crime, the other not." *Id.* at 292–93. In the first case—*Direct Sales Co. v. United States*, 319 U.S. 703 (1943)—the Supreme Court held that a mail-order pharmacy could be convicted for aiding a doctor's illegal distribution of narcotics tablets. *Id.* at 714. In that case, the pharmacy sold the doctor far more tablets than the average doctor required and "actively stimulated" the sales by giving the doctor special discounts for his outsized orders and using "high-pressure sales methods." *Id.* at 705, 712. Moreover, the government had informed the pharmacy that it was being used "as a source of supply" by lawbreaking doctors. *Id.* at 707.

On the other hand, in *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506–07 (2023), the Supreme Court reversed a decision that allowed a lawsuit to proceed against Twitter for aiding and abetting a terrorist attack carried out by ISIS. The Supreme Court noted that ISIS was active on Twitter, which is "generally available to the internet-using public with little to no front-end screening." *Id.* at 498. The Supreme Court also highlighted that the only affirmative conduct Twitter "allegedly undertook was creating [its] platform[] and setting up [its] algorithms to display content relevant to user inputs and user history." *Id.* There was no allegation that Twitter "selected or took any action at all with respect to ISIS' content." *Id.* Twitter's relationship with ISIS and its supporters, the Supreme Court reasoned, was "the same as [its] relationship with [its] billion-plus other users: arm's length, passive, and largely indifferent." *Id.* at 500. Under those circumstances, Twitter's general knowledge that "some bad actors took advantage" of its products for criminal purposes did not state a claim for aiding and abetting. *Id.* at 503.

Applying this case law to Mexico's allegations, the Supreme Court held in *Smith & Wesson* that Mexico's complaint did not plausibly allege aiding-and-abetting liability sufficient to invoke the predicate exception. 605 U.S. at 294. Several considerations led to the Supreme Court's conclusion. First, the Supreme Court observed that Mexico's complaint "[did] not pinpoint, as most aiding-and-abetting claims do, any specific criminal transactions that the defendants (allegedly) assisted," such as providing allegations "that a given manufacturer aided a given firearms dealer, at a particular time and place, in selling guns to a given Mexican trafficker not legally permitted to buy them under a specified statute." *Id.* Rather, the complaint was based on a more general accusation "that all the manufacturers assist some number of unidentified rogue gun dealers in making a host of firearms sales in violation of various legal bars." *Id.*

Second, the Supreme Court found Mexico's analogy to *Direct Sales* unavailing because that case involved more "particularized" allegations that "the aid given to a single named offender [violated] a specified narcotics law." *Id.* at 294–95. The Supreme Court further highlighted that the pharmacy in *Direct Sales* "did more than sell a product to a known lawbreaker" but also "actively stimulated" the doctor's "far-greater-than-average purchases." *Id.* at 295.

Finally, the Supreme Court observed that the manufacturers did not actually sell directly to the bad-apple retailers, but instead to middlemen wholesalers, who in turn sold firearms to the retailers. *Id.* The complaint, in the Supreme Court's view, failed to "offer some reason to believe that the manufacturers attend to the conduct of individual gun dealers, two levels down" in the supply chain. *Id.* Nor had the complaint indicated who

the bad-apple dealers were or how the manufacturers would find out that they were indeed bad apples. *Id.* at 295–96.

Applying this recent and ample guidance to the allegations here, the Court concludes that this case is more akin to *Direct Sales* than *Twitter* and therefore survives the Supreme Court's holding in *Smith & Wesson*. Perhaps the most important similarity between this case and *Direct Sales* is the presence of "red flags" that alerted the aider and abettor to the criminal acts of the principal. In *Direct Sales*, the pharmacy was aware that the doctor was purchasing excessive amounts of narcotic tablets, which was a glaring red flag that the doctor was illegally distributing the tablets. *See Direct Sales*, 319 U.S. at 706–07. Plaintiffs similarly allege the presence of red flags, including multiple multi-firearms transactions, that purportedly alerted Fleet Farm to the fact that Horton was a straw purchaser. ECF No. 1-1 ¶¶ 46, 56–59. And like *Direct Sales*, these red flags came against the backdrop of "law enforcement warnings"; indeed, the red flags alleged by Plaintiffs derive from red flags published and disseminated to firearms dealers by the ATF. *Smith & Wesson*, 605 U.S. at 292–93.

It is true that Plaintiffs' complaint does not allege that Fleet Farm "actively stimulated" Horton's purchasing, which was an "important" fact to the Supreme Court. *Id.* at 292. But the Supreme Court did not hold that that absence of active stimulation was dispositive to the aiding-and-abetting inquiry. And this case is poles apart from the contrasting case discussed by the Supreme Court: *Twitter*.

There, all Twitter was alleged to have done was maintain its social media platform, which was "generally available to the internet-using public with little to no front-end

screening." 598 U.S. at 498. But unlike Twitter, Fleet Farm has a duty under federal law to screen purchasers of firearms and to stop a firearms transaction if Fleet Farm has "reasonable cause to believe" that a purchaser is either prohibited from receiving or possessing a firearm or that the purchaser will transfer the firearm to someone prohibited from receiving or possessing a firearm. *See* 18 U.S.C. § 922(d). And here, Plaintiffs allege that Fleet Farm did, in fact, know that Horton was a straw purchaser. ECF No. 1-1 ¶¶ 46, 56–60. Plaintiffs' complaint, therefore, does not simply plead that Fleet Farm had some vague, general knowledge that "some bad actors took advantage" of its products for criminal purposes. *Twitter*, 598 U.S. at 503. Rather, the complaint alleges that Fleet Farm had particular knowledge that one very specific bad actor (Horton) engaged in straw purchasing from Fleet Farm. Those allegations go beyond pleading an "arm's length, passive, and largely indifferent" relationship between Fleet Farm and Horton. *Id.* at 500.

This conclusion is bolstered by comparing what Plaintiffs allege to what Mexico *did not* allege. The Supreme Court faulted Mexico's complaint for relying on generalized accusations of misconduct and failing to "pinpoint, as most aiding-and-abetting claims do, any specific criminal transactions that the defendants (allegedly) assisted." *Smith & Wesson*, 605 U.S. at 294. But here, Plaintiffs provide 24 precise straw purchases which Fleet Farm allegedly aided and abetted. ECF No. 1-1 ¶ 55. Plaintiffs allege the dates of those transactions, the Fleet Farm locations at which Horton purchased the firearms, the types of firearms that Horton purchased, and the serial numbers of the firearms that Horton purchased. *Id.* Horton's straw purchasing was so egregious that he was eventually convicted of federal felony firearms charges. *Id.* ¶ 64. Plaintiffs' allegations in this case

43

provide far more of the particularity expected in an aiding-and-abetting claim that the Supreme Court found lacking in Mexico's complaint in *Smith & Wesson*.

Second, the Supreme Court observed that Mexico's complaint did not allege a particular instance of "the aid given to a single named offender in violating a specified [firearms] law." *Smith & Wesson*, 605 U.S. at 294–95. But Plaintiffs' complaint here alleges a particular instance (the transaction on July 31, 2021) of aid given to a single named offender (Horton) in violating a specified firearms law (Plaintiffs cite several, but aiding and abetting Horton's false statement on ATF Form 4473 in violation of 18 U.S.C. § 922(a)(6), 18 U.S.C. § 924(a)(1)(A), 18 U.S.C. § 924(a)(1)(D), Minn. Stat. §§ 624.7132–.7133 seems most salient). ECF No. 1-1 ¶¶ 55, 62, 65.

Finally, this case does not implicate the "middleman" problem that the complaint in *Smith & Wesson* presented. *See* 605 U.S. at 295–96. Unlike in *Smith & Wesson*, in which the defendant gun manufacturers did not sell directly to the alleged bad actors, Plaintiffs here allege that Fleet Farm sold directly to Horton with the knowledge that he was purchasing firearms as a straw purchaser. ECF No. 1-1 ¶¶ 46, 55–60. That is sufficient to plausibly allege "an affirmative act in furtherance of" a firearms offense and "the intent of facilitating" the commission of a firearms offense. *Rosemond*, 572 U.S. at 71. In other words, if Fleet Farm sold Horton a firearm knowing that he was a straw purchaser, then Fleet Farm would have sold him the firearm "with full knowledge of the circumstances constituting the charged offense"—specifically, Horton's false statement on ATF Form 4473. *See id.* at 77.

44

In sum, the Court finds that Plaintiffs at this stage have sufficiently alleged that Fleet Farm aided and abetted Horton's straw purchasing in violation of federal firearms laws, which unlocks the predicate exception to Plaintiffs. The next question, then, is whether Fleet Farm's aiding-and-abetting of Horton's straw purchasing is a proximate cause of Plaintiffs' injuries. *See* 15 U.S.C. § 7903(5)(A)(iii); *Smith & Wesson*, 605 U.S. at 286 (explaining that under the predicate exception, a plaintiff must allege that a dealer "committed a gun-sale violation proximately causing the harm at issue"). As detailed below, *see infra* at 51–54, Plaintiffs have adequately alleged (at least at this juncture) that Fleet Farm's aiding of Horton's straw purchasing proximately caused their injuries. Specifically, because it is foreseeable that a firearm sold to a straw purchaser such as Horton will end up in a violent crime like a shooting in a Twin Cities bar, Plaintiffs have plausibly alleged that Fleet Farm's sale of a firearm to a straw purchaser is the proximate cause of Plaintiffs' injuries from the shooting. Plaintiffs' aiding-and-abetting theory of liability may therefore proceed.

### b.    Sufficiency of Plaintiffs' Allegations

Having concluded that Plaintiffs' negligence and negligence per se claims against Fleet Farm are not preempted by PLCAA, the Court next turns to evaluating whether Plaintiffs have plausibly alleged those claims under Federal Rule of Civil Procedure 12(b)(6).

### i.    Negligence (Count II)

To establish a negligence claim under Minnesota law, Plaintiffs must allege: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the

duty being the proximate cause of the injury. *Gradjelick v. Hance*, 646 N.W.2d 225, 230 (Minn. 2002). Fleet Farm's arguments focus on three of these elements: duty, breach, and proximate cause.

### 1.    Duty of Care

Whether a person has a duty of care "is an issue for the court to determine as a matter of law." *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn. 1985). "[T]here is generally no duty to protect strangers from the criminal actions of a third party." *State v. Back*, 775 N.W.2d 866, 870 (Minn. 2009). However, in Minnesota, "general negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). The Minnesota Supreme Court has also "imposed a duty of reasonable care to prevent foreseeable harm when the defendant's conduct creates a dangerous situation." *Id.* at 26; *see also Delgado v. Lohmar*, 289 N.W.2d 479, 484 (Minn. 1979) (holding that trespassing hunters, who "engaged in an extremely dangerous activity, hunting with high-powered guns[,]" should have foreseen that "the landowner may come out and ask [them] to leave"). To determine whether the plaintiff's harm is foreseeable, the Court "look[s] at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Foss v. Kincade*, 766 N.W.2d 317, 322 (Minn. 2009) (citation omitted). In close cases, the issue of foreseeability should be submitted to the jury. *Domagala*, 805 N.W.2d at 27.

Fleet Farm argues that Plaintiffs are seeking the recognition of a new duty of care, ECF No. 24 at 23, while Plaintiffs argue that a duty arose because Fleet Farm's conduct

created a foreseeable risk of injury to a foreseeable plaintiff, ECF No. 34 at 21. Plaintiffs'

argument finds resonance in existing Minnesota common law.

A defendant who creates a "dangerous situation" has a duty of care to prevent

foreseeable harm. *Domagala*, 805 N.W.2d at 26. The Minnesota Supreme Court has

recognized that the negligent use of firearms creates a dangerous situation because

"[f]irearms are so dangerous that extra care must be taken to guard against accidents."

*Delgado*, 289 N.W.2d at 484.

Congress has echoed this concern in prohibiting the unlicensed distribution of

firearms and the sale of firearms to straw purchasers. In enacting the Omnibus Crime

Control and Safe Streets Act of 1968 (a precursor to the Gun Control Act of 1968),

Congress found that there was a "widespread traffic in firearms moving in or otherwise

affecting interstate or foreign commerce," and that "the ease with which any person can

acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent

crime in the United States." Omnibus Crime Control and Safe Streets Act, Pub. L. 90–351,

82 Stat. 197, 225 (1968). And, in enacting a federal ban on selling firearms to straw

purchasers, the House of Representatives's committee report explicitly noted the strong

connection between straw purchasing of firearms and gun violence in local communities:

> The overwhelming majority of guns recovered in a crime start
> as a legal sale from a licensed dealer. Irresponsible gun dealers
> are the source of many crime guns, and a scourge on these
> communities. These dealers often willfully engage in illegal or

> corrupt behavior—selling guns that they know will be
> trafficked into areas of high crime.

H.R. Rep. No. 117-346, at 16–17 (2022). The committee also noted that gun violence is particularly prevalent "in urban areas with high minority populations," and that "[t]he most frequent type of trafficking channel identified in ATF investigations is straw purchasing." *Id.* Accordingly, if Plaintiffs' allegations are true, and Fleet Farm sold firearms to Horton knowing he was a straw purchaser, then Fleet Farm created a "dangerous situation" and owes a duty of care to prevent foreseeable harm. *Domagala*, 805 N.W.2d at 26; *see Delgado*, 289 N.W.2d at 484.

Whether Plaintiffs' harm was foreseeable to Fleet Farm is a close call, which permits this case to proceed past the pleading stage. *Domagala*, 805 N.W.2d at 27. The Court recognizes that Fleet Farm generally does not have a "duty to protect strangers from the criminal actions of a third party." *Back*, 775 N.W.2d at 870. And had Horton's gun ended up in a shooting thousands of miles away and months, if not years later, the Court may not be inclined to find the resulting harm foreseeable. But here, Horton purchased the firearm at issue from a Fleet Farm in Blaine, and just over two months later, that firearm was used in a shooting less than 20 miles away in St. Paul. ECF No. 1-1 ¶¶ 55, 62. As Congress itself recognized, firearms purchased by straw purchasers often end up becoming a "scourge" on urban communities where the firearms are sold, H.R. Rep. No. 117-346, at 16–17, which is essentially what is alleged in this case. And the ATF recognizes "a short window of time between the purchase of a firearm and the recovery of the firearm in connection with a crime" as a red flag of straw purchasing. ECF No. 1-1 ¶ 46. Given the

physical and temporal proximity between the sale of the gun to Horton and the shooting at Truck Yard's bar, the Court concludes that the "specific danger" resulting from gun violence in a Twin Cities bar was "objectively reasonable to expect" from the knowing sale of a gun to a straw purchaser in the Twin Cities. *Foss*, 766 N.W.2d at 322; *cf. Canada ex rel. Landy v. McCarthy*, 567 N.W.2d 496, 506 (Minn. 1997) (physical proximity to harm supports finding of foreseeable and proximate harm).

### 2.    Breach

Fleet Farm next argues that Plaintiffs have not plausibly alleged that it breached any duty of care by violating the various federal and state laws relating to firearms transactions and possession described in Plaintiffs' complaint. ECF No. 24 at 15–19. Fleet Farm first argues that five of the cited statutes in the complaint regulate customer conduct—not the conduct of a federally licensed firearms dealer—and so Fleet Farm could not possibly have violated those statutes. *Id.* at 15–17. But Plaintiffs allege that these statutes are relevant to their aiding-and-abetting theory of liability because, according to Plaintiffs, Fleet Farm aided and abetted Horton's unlicensed distribution of firearms, 18 U.S.C. §§ 922(a)(1), 923(a); unlicensed transfer of firearms, Minn. Stat. § 624.7133; and false statements to Fleet Farm in procuring the firearms, 18 U.S.C. §§ 922(a)(6), 924(a)(1)(A); Minn. Stat. § 624.7132, subd. 15(a)(4). *See* ECF No. 1-1 ¶¶ 65, 89–90. Even if Fleet Farm did not directly violate those statutes, Plaintiffs may demonstrate Fleet Farm's negligence if Fleet Farm knowingly aided and abetted Horton's violation of those statutes. *See Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999) (describing civil aiding-and-abetting liability).

Next, Fleet Farm observes that the criminal statutes cited by Plaintiffs do not provide a private right of action. ECF No. 24 at 17–18. That is true. But it is not relevant here. Plaintiffs are not seeking a private right of action through these criminal statutes. Rather, Plaintiffs are using the criminal statutes to frame Fleet Farm's duty of care. *See* ECF No. 1-1 ¶¶ 89–90. Plaintiffs may do so. *See Engvall v. Soo Line R.R. Co.*, 632 N.W.2d 560, 568–69 (Minn. 2001) (establishing that while a statute may not by its own terms confer a private right of action, this "merely means that [such statutes] do not provide statutory causes of action, and that a party suing for violation of [them] must do so under a common law action"); *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981) (describing criminal statute as one that could frame duty-of-care in negligence action).

Finally, Fleet Farm disputes the sufficiency of Plaintiffs' allegations with respect to Fleet Farm's alleged violations of four additional statutes and regulations.[8] ECF No. 24 at 18–19. As to three of these laws—18 U.S.C. § 922(m), 27 C.F.R. § 478.124(c)(5), and 27 C.F.R. § 478.21(a)—Fleet Farm ignores Plaintiffs' core allegation: that Fleet Farm knowingly sold a firearm to a straw purchaser. Assuming that allegation is true, Fleet Farm would have made a false entry on ATF Form 4473 in violation of 18 U.S.C. § 922(m), which requires firearms dealers to sign ATF Form 4473 *only if* the dealer "does not know or have reasonable cause to believe" that the firearms transaction is prohibited, 27 C.F.R. § 478.124(c)(5). And Fleet Farm would have violated 27 C.F.R. § 478.21(a)'s requirement that "information called for in [ATF Form 4473] shall be furnished as required by [27

---

[8]    The fifth statute challenged in this section is 18 U.S.C. § 923(a), which has already been addressed above.

C.F.R. § 478 *et seq.*]."  Plaintiffs may therefore premise their negligence claim on these three laws.

However, as to the remaining regulation—27 C.F.R. § 478.124(c)(1)—Plaintiffs fail to allege any conduct by Fleet Farm that violates this regulation.  That regulation required Fleet Farm to obtain an ATF Form 4473 from Horton.  However, there is no allegation that Fleet Farm failed to obtain an ATF Form 4473 from Horton; rather, Plaintiffs allege that the ATF Form 4473 was falsely completed, in violation of other federal laws and regulations.  *See, e.g.*, ECF No. 1-1 ¶ 65.  Accordingly, Plaintiffs may not premise their negligence claims against Fleet Farm on a violation of 27 C.F.R. § 478.124(c)(1).

### 3.    Proximate Cause

Fleet Farm argues that its sale of the firearm to Horton was not a proximate cause of Plaintiffs' injuries as a matter of law.  ECF No. 24 at 26–29.  For a party's negligence to be the proximate cause of an injury, "the injury must be a foreseeable result of the negligent act and the act must be a substantial factor in bringing about the injury."  *Staub ex rel. Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620 (Minn. 2021).  "There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury."  *Id.* at 621.  "Generally, whether the defendant's negligence proximately caused the plaintiff's injuries is a question of fact for the jury."  *McCarthy*, 567 N.W.2d at 506.  "However, when reasonable minds could reach only one conclusion, the existence of proximate cause is a question of law" that may be decided by the Court. *Id.*

Fleet Farm observes the general rule that "a criminal act of a third person is an intervening efficient cause sufficient to break the chain of causation." *Hilligoss v. Cross Cos.*, 228 N.W.2d 585, 586 (Minn. 1975). However, "to be a legally sufficient intervening cause, the criminal act itself must not be reasonably foreseeable." *Id.* And "the specific conduct need not have been reasonably foreseeable if the unreasonable risk of harm was reasonably foreseeable." *Indep. Sch. Dist. No. 14 v. AMPRO Corp.*, 361 N.W.2d 138, 144 (Minn. Ct. App. 1985) (citing *Rum River Lumber Co. v. State*, 282 N.W.2d 882, 884 (Minn. 1979)); *see also Domagala*, 805 N.W.2d at 27 (citation omitted) (explaining that foreseeability turns not on "whether the precise nature and manner of the plaintiff's injury was foreseeable," but on whether "the possibility of an accident was clear to the person of ordinary prudence").

Fleet Farm offers three purported intervening acts that break the chain of causation: (1) Horton's illegal transfer of the handgun to Young-Duncan, (2) Young-Duncan's illegal transfer of the handgun to Phillips (or some other third party), and (3) Phillips' criminal use of the handgun in the October 2021 shooting. ECF No. 24 at 36. But assuming as true Plaintiffs' allegation that Fleet Farm knowingly sold firearms to a straw purchaser, each of these criminal acts would be reasonably foreseeable to Fleet Farm.

If Fleet Farm sold a firearm to Horton knowing that he was a straw purchaser, then it would be reasonably foreseeable that the firearm would end up in somebody else's hands; indeed, that is the very definition of a straw purchaser. *See Abramski*, 573 U.S. at 171–72 (defining a straw purchaser as "a person who buys a gun on someone else's behalf while falsely claiming that it is for himself"). And, given that firearms purchased by a straw

purchaser often end up involved in violent crime, H.R. Rep. No. 117-346, at 16–17, it would be reasonably foreseeable to Fleet Farm that the firearm it sold to Horton would end up in a violent crime like a shooting. Although Fleet Farm may not have reasonably foreseen the "specific conduct" Horton and Phillips would engage in, it is enough that Fleet Farm would have reasonably foreseen an "unreasonable risk of harm" from selling a firearm to a known straw purchaser. *AMPRO Corp.*, 361 N.W.2d at 144; *see also Knight v. Wal-Mart Stores, Inc.*, 889 F. Supp. 1532, 1541–42 (S.D. Ga. 1995) ("Cases dealing with gun purchasers who then harm third parties hold that the gun seller may be held liable for foreseeable harm resulting from the sale, despite several intervening acts.").

The Eighth Circuit's decision in *Ashley County v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009)—relied upon by Fleet Farm—is poles apart from this case. As an initial matter, the Eighth Circuit in *Ashley County* applied Arkansas law, not Minnesota law. *Id.* at 665. But even on the merits in that case, the Eighth Circuit concluded that a county's asserted injury of "providing government services to deal with the methamphetamine epidemic" was not reasonably foreseeable to a manufacturer of over-the-counter cold medicine (which can be used to manufacture methamphetamine). *Id.* at 667–68. The injury from a straw purchaser providing a gun to a shooter does not implicate the same "long and tortuous" chain of causation presented in *Ashley County*. *Id.* at 669 (citation omitted).

Suffice to say that this case is not one where "reasonable minds could reach only one conclusion" about proximate cause. *McCarthy*, 567 N.W.2d at 506. Even if there were other "substantial factor[s]" leading to Plaintiffs' injuries, Plaintiffs have adequately alleged at this stage that Fleet Farm's sale of a firearm to Horton was a proximate cause of

their injuries.[9]  *Myrtle Lake Resort*, 964 N.W.2d at 620.  Plaintiffs may therefore move

forward with their negligence claim against Fleet Farm.

### ii.        Negligence Per Se (Count III)

Negligence per se "is a form of ordinary negligence that results from violation of a

statute." *Seim*, 306 N.W.2d at 810.  "A per se negligence rule substitutes a statutory

standard of care for the ordinary prudent person standard of care, such that a violation of a

statute . . . is conclusive evidence of duty and breach."  *Gradjelick*, 646 N.W.2d at 231 n.3.

However, not all statutes qualify as statutory standards of care.  Rather, a violation of a

statute or regulation gives rise to negligence per se if (1) the person harmed by that violation

is among those the legislature sought to protect and (2) the harm suffered is of the type the

statute or regulation was intended to prevent.  *Anderson v. State, Dep't of Nat. Res.*, 693

N.W.2d 181, 189–90 (Minn. 2005).

Quoting *Kronzer v. First National Bank of Minneapolis*, 235 N.W.2d 187, 193

(Minn. 1975), Fleet Farm argues that statutes designed to protect "the public at large," such

as the gun-control laws cited by Plaintiffs, do not qualify as statutes that can form the basis

for a negligence per se claim.  ECF No. 24 at 19–20.  In *Kronzer*, the Minnesota Supreme

Court expressed doubt that a statute merely designed "to protect the public at large rather

than a particular class of individuals" could be adopted as a duty of care in a negligence

per se case.  235 N.W.2d at 193.  Plaintiffs attempt to distinguish the language in *Kronzer*

as dicta.  *See* ECF No. 34 at 26.  Although that may be true, the Court's "role is to predict

---

[9]        This conclusion also applies to Plaintiffs' negligence per se claim, which also
requires proof of proximate cause.  *See Gradjelick*, 646 N.W.2d at 232.

how the state supreme court would rule if faced with the same issue." *N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 892 (8th Cir. 2020) (citation omitted).  Even though the language in *Kronzer* may be dicta, the case nonetheless provides strong evidence that the Minnesota Supreme Court would not allow statutes that only benefit the public at large to form the basis of a negligence per se action.  Not to mention that the Minnesota Supreme Court has continued to apply *Kronzer*'s holding.  *See Hage v. Stade*, 304 N.W.2d 283, 287 (Minn. 1981) (statute could not form the duty of care in a negligence per se action when the statute "benefits the public as a whole").

Regardless of the language in *Kronzer*, however, a case from more than a century ago—involving a negligence per se claim framed by firearms regulations—is directly on point and controlling.  In *Anderson v. Settergren*, the defendants owned a hardware store and loaned a rifle to a minor child, which violated a state law prohibiting minors from possessing firearms and prohibiting anyone from aiding a minor to possess a firearm.  111 N.W. 279, 279 (Minn. 1907).  The child then injured the plaintiff with the rifle.  *Id.*  The plaintiff sued the defendants on a theory of negligence per se, and the trial court dismissed the case.  *Id.*

The Minnesota Supreme Court reversed.  The Court followed the modern negligence per se doctrine by first asking whether the plaintiff was "within the class for whose benefit legislation creating not a purely public duty was designed."  *Id.* at 279–80.  The Court explained that "the present general, if not universal, trend of American authorities, is to construe legislative enactments of this type as creating a duty to both the public and to private individuals, and to liberally interpret the class of persons for whose

benefit the law was made." *Id.* at 280.  The Court concluded that the plaintiff was "clearly within the class for the avoidance of evil to which the law was enacted." *Id.*  The Court grounded its conclusion in the unique danger of firearms:

> Inasmuch as firearms are instruments whose destructive power is obvious to every one, the common law imposed strict rules of liability for damage done by them.  When the damage resulted from the discharge of firearms actually in hand or under the immediate control, the person having them under control was held to be almost absolutely responsible.

*Id.  Settergren* is not an anomaly: other courts have similarly held that violations of federal and state gun control laws causing injury amount to negligence per se.  *See, e.g.*, *Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529–30 (3d Cir. 1979); *West v. Mache of Cochran, Inc.*, 370 S.E.2d 169, 171 (Ga. Ct. App. 1988); *Coker v. Wal-Mart Stores, Inc.*, 642 So.2d 774, 776 (Fla. Dist. Ct. App. 1994); *Rubin v. Johnson*, 550 N.E.2d 324, 329–30 & n.7 (Ind. Ct. App. 1990); *Lundy v. Hazen*, 411 P.2d 768, 770 (Idaho 1966).

Plaintiffs' claims are identical to the claims in *Settergren*: in both cases, the plaintiffs premise their negligence per se claims on violations of gun-control laws.  And *Settergren* is still good law in Minnesota: it has not been overruled, nor has its reasoning been undermined by more recent negligence per se case law in Minnesota.  The Court must therefore follow *Settergren*.  *See Cont'l Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006) ("Decisions from the state supreme court as to state law are binding on this court.").  Because the Minnesota Supreme Court has concluded that firearms regulations are not simply designed to protect the public at large, this Court concludes that Plaintiffs may premise their negligence per se claims on such regulations.

Alternatively, Fleet Farm argues that the negligence per se claim fails because none of the statutes relied upon by Plaintiffs create a private right of action. ECF No. 24 at 20–21. Fleet Farm's position is, quite simply, not the law. Minnesota law permits statutes lacking a private cause of action to form the basis of a negligence per se action. *Seim*, 306 N.W.2d at 811 ("[S]tatutes forming the basis of a negligence per se action are often penal and do not expressly provide for a civil action."); *Femrite v. Abbott Nw. Hosp.*, 568 N.W.2d 535, 539 n.4 (Minn. Ct. App. 1997).[10] Indeed, "Minnesota law permits negligence per se claims premised on statutes . . . that do not explicitly confer a private right of action" if "(1) the person harmed by violation [of the statute] is among those the legislature sought to protect and (2) the harm suffered is of the type the statute or regulation was intended to prevent." *Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 754–55 (D. Minn. 2023) (citations omitted). The Court disagreed with Fleet Farm's argument on the first element, and Fleet Farm does not challenge the second element. And because the Court has previously concluded that Plaintiffs have plausibly alleged that Fleet Farm violated most of the statutes and regulations listed in the complaint, at this stage Plaintiffs have adequately stated a negligence per se claim against Fleet Farm.

---

[10]     To the extent that the nonbinding case law cited by Fleet Farm, ECF No. 24 at 29–30, conflates the negligence per se analysis with the analysis for evaluating whether a statute confers a private right of action, that analytical entanglement makes no sense: if a statute conferred a private right of action, there would be no need for a negligence per se claim, and the entire negligence per se action would become wholly superfluous.

### iii.    Aiding and Abetting Liability

Finally, Fleet Farm challenges Plaintiffs' attempt to premise their negligence on Fleet Farm's alleged aiding-and-abetting of Horton's crimes.  ECF No. 24 at 31–32.  Civil liability for aiding and abetting the tortious acts of another requires proof of three elements: (1) the primary tortfeasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.[11]  *Witzman*, 601 N.W.2d at 187.  Fleet Farm only disputes the final two elements.

### 1.    Fleet Farm's Knowledge of Primary Tortfeasor's Wrongdoing

Fleet Farm argues that Plaintiffs inadequately pleaded Fleet Farm's knowledge that Horton was violating various gun-control laws.[12]  However, as explained above, Plaintiffs

---

[11]    Although *Smith & Wesson* required the Court to look to federal criminal aiding-and-abetting case law to determine if that theory of liability survived PLCAA preemption, 605 U.S. at 291, the Court must look to Minnesota civil aiding-and-abetting case law to determine if that theory of liability plausibly states a claim under state law.

[12]    Fleet Farm argues that Plaintiffs must plead Fleet Farm's scienter for aiding-and-abetting liability with particularity under Fed. R. Civ. P. 9(b).  ECF No. 24 at 31.  That would be true if Plaintiffs were alleging that Fleet Farm aided and abetted *fraud.  See Zayed v. Associated Bank, N.A.* ("*Zayed I*"), 779 F.3d 727, 733 (8th Cir. 2015); *see* Fed. R. Civ. P. 9(b) (requiring fraud to be pled with particularity).  But Plaintiffs allege that Fleet Farm aided and abetted *negligence*, a claim which is not subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  *See In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) ("[F]ederal courts may not apply the heightened pleading standard of Rule 9(b) outside the two specific instances—fraud and mistake—explicitly found in the Rule.").  The Court therefore applies the plausibility standard of Fed. R. Civ. P. 8 to Plaintiffs' allegations of scienter.

have adequately pleaded the existence of "red flags" that—if true—alerted Fleet Farm to Horton's status as a straw purchaser. *Id.* ¶¶ 46, 56–59. Because the issue of scienter is generally "a question of fact for the jury," all a plaintiff must do at the pleading stage is provide "a factual basis for allegations of scienter." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002). Plaintiffs have done so.

Citing *Zayed v. Associated Bank, N.A.* ("*Zayed II*"), 913 F.3d 709, 715 (8th Cir. 2019), Fleet Farm argues that the existence of "red flags" cannot, as a matter of law, establish scienter for purposes of aiding-and-abetting liability. ECF No. 24 at 32. But Fleet Farm takes the language in *Zayed II* out of context. *Zayed II* explained that to show knowledge for aiding-and-abetting liability, a plaintiff must show more than "awareness of the conduct in question . . . , that it raised 'red flags,' . . . or even that it amounted to gross negligence," but must show that the defendant "was aware of the wrongfulness of the challenged conduct." *Id.* at 715 (citation omitted). Here, Plaintiffs allege conduct that did not just raise "red flags," but conduct that "put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms." ECF No. 1-1 ¶ 60. If Fleet Farm was "on notice that Horton was engaged in straw purchasing," then it was aware that Horton was engaging in wrongful conduct. Although discovery may ultimately uncover otherwise, Plaintiffs at this stage have sufficiently pleaded Fleet Farm's knowledge of Horton's wrongful conduct.

## 2.    Substantial Assistance or Encouragement

Fleet Farm also argues that it did not "substantially assist or encourage" Horton in his tortious activity because "routine professional services" like selling firearms cannot

constitute substantial assistance. ECF No. 24 at 32 (quoting *Zayed v. Associated Bank, N.A.* ("*Zayed I*"), 779 F.3d 727, 735 (8th Cir. 2015)). *Zayed I*'s holding regarding "routine professional services" refers to the Minnesota Supreme Court's decision in *Witzman*, which held that "in cases where aiding and abetting liability is alleged against professionals, [a court] will narrowly and strictly interpret the elements of the claim and require the plaintiff to plead with particularity facts establishing each of these elements." 601 N.W.2d at 187.

The Court is not persuaded that the "routine professional services" strand of case law applies to the retail sales of firearms. *Witzman* was referring to professional services that typically involve a "professional-client relationship," like attorneys and accountants, *id.* at 186–87, and bankers, *Zayed I*, 779 F.3d at 735. On the contrary, retail firearms sales do not involve the same sort of special relationship akin to the one between clients and their attorneys, accountants, and bankers. Accordingly, the strict application of the aiding-and-abetting doctrine for professionals does not apply here.

In any case, Plaintiffs have adequately pleaded the third element of aiding-and-abetting liability. To demonstrate "substantial assistance," the defendant's conduct must "further the [tort] itself, and not merely constitute general aid to the tortfeasor." *Id.* (citation omitted). The conduct in question must be undertaken with "some degree of knowledge" of its wrongful purpose and that it is aiding the tortfeasor. *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 859 (D. Minn. 2013) (citation omitted). Here, Plaintiffs allege that Fleet Farm furthered Horton's negligence in straw purchasing a firearm by permitting him to purchase firearms despite knowing that Horton was a straw purchaser. ECF No. 1-1 ¶ 60. That allegation checks all the boxes of substantial assistance: furthering Horton's

negligence with knowledge of Horton's wrongful motive.  Plaintiffs may therefore proceed at this stage with their aiding-and-abetting theory of liability against Fleet Farm.

In sum, the Court concludes that Plaintiffs' negligence and negligence per se claims may proceed against Fleet Farm.

## III.    Merits of Plaintiffs' Claims Against Truck Yard

Plaintiffs' complaint alleges a single count of negligence against Truck Yard for the injuries sustained by the shooting committed by Phillips and Brown.  ECF No. 1-1 ¶¶ 66–84.  Recognizing that "there is generally no duty to protect strangers from the criminal actions of a third party," *Back*, 775 N.W.2d at 870, the parties' arguments largely center on whether Truck Yard owed Plaintiffs a duty of care.  Plaintiffs raise four theories on which they premise the existence of a duty of care: innkeeper liability, premises liability,[13] voluntary assumption of duty, and "own conduct."  ECF No. 33 at 9–18.  The Court considers the viability of each theory in turn.

### a.    Innkeeper Liability

Innkeeper liability is a species of negligence stemming from a bar's "duty to maintain safety and order for the protection of its patrons."  *Boone v. Martinez*, 567 N.W.2d 508, 510 (Minn. 1997).  To state a claim for innkeeper liability, a plaintiff must allege:

> (1) The proprietor must be put on notice of the offending party's vicious or dangerous propensities by some act or threat,

---

[13]    The precise theory of liability for this claim is murky.  Plaintiffs frame this theory as one of a "special relationship," but all of the cases cited by Plaintiffs deal with premises liability, not a duty imposed as the result of a special relationship.  *See Louis v. Louis*, 636 N.W.2d 314, 320 (Minn. 2001) ("[A] duty based on a special relationship theory is separate and distinct from a duty based on a premises liability theory.").  The Court therefore construes Plaintiffs' argument to refer to premises liability.

(2) the proprietor must have an adequate opportunity to protect the injured patron,

(3) the proprietor must fail to take reasonable steps to protect the injured patron, and

(4) the injury must be foreseeable.

*Id.*

Plaintiffs' innkeeper liability claim fails as a matter of law because Plaintiffs make no allegations regarding the first element: that Truck Yard was on notice of Phillips's and Brown's "vicious or dangerous propensities." *Id.* For the notice element of innkeeper liability, Plaintiffs cannot merely allege that Truck Yard was on notice that "any patron might be injured by another patron"; rather, Plaintiffs must allege that Truck Yard was specifically on notice that *Phillips* and *Brown* would cause injury to patrons of the bar. *Friesen v. VFW Post 2793*, No. A19-1198, 2020 WL 610595, at *2–3 (Minn. Ct. App. Feb. 10, 2020); *see Minks*, 2007 WL 1053501, at *2–3 (rejecting the notion that a bar's notice can be imputed by "see[ing] or hear[ing] threatening activity by some persons"); *Edgar v. Moose Lodge 2023*, No. A16-1278, 2017 WL 1842833, at *2 (Minn. Ct. App. May 8, 2017) (finding no notice with respect to the plaintiff's assailant's "vicious and dangerous propensities").

Plaintiffs offer no such allegations. Rather, they allege that Truck Yard was on notice that "an individual would attempt to enter [the bar] carrying a weapon or firearm" and that "violent and non-violent criminal acts . . . had or were reasonably likely to be

perpetrated" on the bar's patrons.  ECF No. 1-1 ¶¶ 68–69.  None of these allegations are specific to Truck Yard's knowledge of Phillips and Brown.

In response, Plaintiffs quote *Connolly v. Nicollet Hotel*, in which the Minnesota Supreme Court explained that "it is not necessary that [an innkeeper] should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the person of ordinary prudence." 95 N.W.2d 657, 664 (Minn. 1959). But the issue here is not about the *how* of the injury, but the *who*.  And for the *who* inquiry, *Boone* and its progeny plainly require Plaintiffs to allege that Truck Yard had notice of the "*offending party's* vicious or dangerous propensities."  *Boone*, 567 N.W.2d at 510 (emphasis added).  Because Plaintiffs offer no allegations about Truck Yard's notice with respect to Phillips and Brown, their innkeeper liability claim fails as a matter of law.  *Id.* at 510–11.  And because Plaintiffs do not sufficiently allege notice, they also fail to sufficiently allege foreseeability.  *See Alholm v. Wilt*, 394 N.W.2d 488, 491 n.5 (Minn. 1986) (explaining that if there is no notice, then "the injury would not have been foreseeable to a reasonable innkeeper").  Plaintiffs may not proceed on an innkeeper liability claim.

### b.    Premises Liability

Plaintiffs next raise a theory of premises liability.  ECF No. 33 at 10–12.  Premises liability implicates a landowner's duty "to use reasonable care for the safety of all such persons invited upon the premises."  *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001) (citation omitted).  Plaintiffs argue that Truck Yard owed Plaintiffs a duty of care by virtue of Truck Yard being a "possessor[] of land who hold[s] it open to the public."  ECF No. 33

63

at 11.  But Plaintiffs do not explain how this duty differs from the duty of care that Truck Yard already owed to them under a theory of innkeeper liability.  Indeed, the "duty to maintain safety and order" imposed by innkeeper liability, *see Boone*, 567 N.W.2d at 510, effectively overlaps with the duty "to use reasonable care for the safety of all such persons invited upon the premises" imposed by premises liability, *Louis*, 636 N.W.2d at 318 (citation omitted).  Plaintiffs cite no authority that permits premises liability and innkeeper liability claims to coexist in the same action, and Plaintiffs fail to identify a distinct duty of care imposed on Truck Yard under a theory of premises liability.  Accordingly, a premises liability theory of liability must fail.  *See McDonough v. Toles*, 476 F. Supp. 3d 882, 898 (D. Minn. 2020) (dismissing duty-of-care theory against a bar because the plaintiff could not explain how the alleged duty "differs from the duty of care that the Bar already owed him" under innkeeper liability).

### c.    Voluntary Assumption of Duty

Plaintiffs style their third theory of liability as a "negligent performance of an assumed duty" claim.  ECF No. 1-1 ¶¶ 71–77.  Plaintiffs observe the rule that "one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so."  *Isler v. Burman*, 232 N.W.2d 818, 822 (Minn. 1975).  Plaintiffs accordingly allege that by providing security at the bar, Truck Yard voluntarily assumed a duty "to provide security on the premises" and "to deter violent crime, including gun violence on its premises."  ECF No. 1-1 ¶¶ 71, 73.  Plaintiffs allege that Truck Yard failed to exercise reasonable care in performing that duty by, among other things: failing to provide adequate security at the bar, failing to properly search and inspect

patrons before entering the bar, failing to warn patrons of the potential danger of a shooting, and failing to ban firearms at the bar.  *Id.* ¶ 74.

Plaintiffs cite no case law holding that a duty of care arises by the bare fact that a public establishment hires security, and the Court is not persuaded that the Minnesota Supreme Court would impose such a duty.  Informing the Court's conclusion is *Robb v. Funorama, Inc.*, No. A04-1711, 2005 WL 1331265 (Minn. Ct. App. June 7, 2005), in which a plaintiff was assaulted at a roller-skating rink by another customer.  *Id.* at *1.  The plaintiff argued that the rink had assumed a duty of care by hiring security and using metal detectors at the rink's entrance.  *Id.* at *5.  The Minnesota Court of Appeals held that the rink did not owe a duty of care to the plaintiff, observing that if the act of hiring security imposed a duty of care on the rink, then businesses would be chilled "from undertaking more stringent security measures in the future, for fear that an assault despite the security precautions would subject it to liability."  *Id.*

Because the recognition of a duty of care is influenced by public policy considerations, *see L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 378 (Minn. 1989), the Court is persuaded by *Robb* that imposing a duty of care on a bar because it imposes security measures could have the unfortunate policy effect of *deterring* bars from imposing security measures in the first place.  *See McDonough*, 476 F. Supp. 3d at 898 ("[I]t would be strange indeed—and inimical to public policy—if the mere fact that a bar hired security

personnel in an effort to comply with its already-existing duty of care had the effect of making that duty stricter or otherwise expanding the bar's liability.")

*Robb* does suggest that an assumption-of-duty claim may be made if the plaintiff "relied on [the defendant's] security representations and refrained from taking action to protect himself based on that reliance." *Robb*, 2005 WL 1331265, at *5 (first citing *Williams v. Harris*, 518 N.W.2d 864, 868 (Minn. Ct. App. 1994); and then citing *Nickelson v. Mall of Am. Co.*, 593 N.W.2d 723, 726 (Minn. Ct. App. 1999)). However, like in *Robb*, Plaintiffs make no allegations that Truck Yard made security representations, that Plaintiffs relied on any such representations, and that they refrained from taking action to protect themselves based on that reliance. In the absence of such allegations, Plaintiffs' assumption-of-duty argument fails.

Plaintiffs' complaint could also be read to assert a claim for "negligent security"—indeed, that is how Truck Yard understands Plaintiffs' complaint. ECF No. 18 at 12. However, as noted in the jurisdictional analysis above, Plaintiffs expressly disclaim reliance on a "negligent security" theory of liability. *See* ECF No. 33 at 18. The Court will therefore not address the viability of such a claim under Minnesota law.[14] See *Johnson v.*

---

[14]    Plaintiffs argue that the Minnesota Court of Appeals recognized an assumed duty of care from hiring security in *Roloff v. Taste of Minn.*, 488 N.W.2d 325 (Minn. Ct. App. 1992). ECF No. 33 at 16–17. Not so. That case had nothing to do with an assumption-of-duty theory of liability; rather, it dealt with a cause of action for negligent security—a theory of liability which Plaintiffs have disclaimed. *Roloff*, 488 N.W.2d at 326. Nonetheless, *Roloff* did not recognize the existence of a negligent-security cause of action under Minnesota law; rather, it simply held that such a claim did not fall within an insurance policy's coverage exclusion for acts of assault and battery. *Id.* It is a huge stretch to argue that *Roloff* recognized the tort of negligent security, particularly given that the Minnesota

66

*Bank of N.Y. Mellon*, No. 22-cv-2848 (ECT/LIB), 2023 WL 204088, at *4 (D. Minn. Jan. 17, 2023) (citation omitted) ("A party's failure to oppose specific arguments in a motion to dismiss results in waiver of those issues."). The assumption-of-duty theory of liability may not proceed.

### d.    "Own Conduct"

Finally, Plaintiffs argue that Truck Yard is liable for negligence on an "own conduct" theory of liability. ECF No. 1-1 ¶¶ 78–84. A defendant has a duty to exercise reasonable care against foreseeable injury if "the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala*, 805 N.W.2d at 23. Under this "own conduct" theory of negligence, Minnesota law distinguishes between misfeasance—the "active misconduct working positive injury to others"—and nonfeasance—the "passive inaction or a failure to take steps to protect [others] from harm." *Fenrich v. Blake Sch.*, 920 N.W.2d 195, 203 (Minn. 2018) (citation omitted). "If a defendant's conduct is mere nonfeasance, that defendant owes no duty of care to the plaintiff for harm caused by a third party." *Id.* If a person "acts in some manner that creates a foreseeable risk of injury to another," however, "the actor is charged with an affirmative duty to exercise reasonable care to prevent his conduct from harming others." *Domagala*, 805 N.W.2d at 26.

Viewing the allegations as true and in a light most favorable to Plaintiffs, *Gorog*, 760 F.3d at 792, Plaintiffs have adequately alleged that Truck Yard engaged in misfeasance. Plaintiffs allege that Truck Yard created a raucous atmosphere at its bar by hiring and

---

Court of Appeals cast doubt on the existence of such a tort 15 years after deciding *Roloff*. *See Minks*, 2007 WL 1053501, at *3–4.

promoting a DJ for weekend evenings that drew large, uncontrollable crowds that spilled out onto West Seventh Street. ECF No. 1-1 ¶¶ 25–28, 34, 78. Promoting an unsafe environment "work[s] positive injury to others" and can constitute misfeasance. *See Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 78–79 (Minn. 2020) (concluding that academic advisor engaged in misfeasance by "knowingly endors[ing] a practicum" that might subject students to unlawful discrimination). Truck Yard protests that any bar will naturally have a convivial, boisterous atmosphere, and that the atmosphere of Truck Yard's bar was not dissimilar from the conduct of other bars. That is a fair argument to make to a jury, but not to this Court on a motion to dismiss, for that would require the Court to impermissibly "resolve a factual dispute on a motion to dismiss." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001).

Plaintiffs have also plausibly alleged that gun violence as a result of this boisterous atmosphere was a foreseeable risk to Truck Yard's patrons; indeed, Ramsey County Sheriff Fletcher predicted a day before the shooting that the crowded, party atmosphere at Truck Yard's bar would eventually lead to a shooting. *Id.* ¶ 30. Plaintiffs also allege that in the year preceding the shooting, the St. Paul Police Department was called to Truck Yard's bar on numerous occasions for violent and criminal incidents. *Id.* ¶ 29. These facts, if true, suggest that the "specific danger [of gun violence] was objectively reasonable to expect." *Fenrich*, 920 N.W.2d at 205 (citation omitted).

Because Plaintiffs have alleged that Truck Yard's own conduct created a foreseeable risk of injury to a foreseeable plaintiff, Truck Yard "is charged with an affirmative duty to exercise reasonable care to prevent [its] conduct from harming others." *Domagala*, 805

N.W.2d at 26.  But, according to Plaintiffs, Truck Yard failed to discharge that duty because it failed to implement adequate security controls to prevent violence against the bar's patrons.[15]  ECF No. 1-1 ¶¶ 74, 78.  If true, then "the care exercised [did not] adequately remedy the harm foreseeable from the defendant's conduct," and Truck Yard would be liable in negligence.  *Domagala*, 805 N.W.2d at 28.  Accordingly, Plaintiffs have plausibly stated a claim for negligence against Truck Yard under an "own conduct" theory of liability.

In sum, although Plaintiffs offer four theories of negligence liability against Truck Yard, only the "own conduct" theory of liability may proceed.[16]

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

---

[15]    Importantly, the relevant "own conduct" here is Truck Yard's promotion of a boisterous, party-like atmosphere, *not* Truck Yard's failure to implement adequate security and safety measures.  The latter cannot be used to frame Truck Yard's "own conduct" because the failure to implement security measures is best classified as nonfeasance—that is, the "failure to take steps to protect [others] from harm."  *Fenrich*, 920 N.W.2d at 203 (alteration in original) (citation omitted).  However, the failure to implement adequate security measures is relevant to whether Truck Yard breached its duty of care arising from its "own conduct" of promoting a raucous atmosphere.

[16]    Plaintiffs and Truck Yard debate whether the Court can consider surveillance video of the shooting at this procedural juncture.  ECF No. 18 at 3; ECF No. 33 at 8–9; ECF No. 41 at 2–3.  The Court has reviewed the surveillance video, but not the color commentary of the video.  *See Jackson v. Brooklyn Center*, No. 21-cv-2072 (SRN/DJF), 2023 WL 2368032, at *5–6 (D. Minn. Mar. 6, 2023) (considering video footage on a motion to dismiss because the authenticity of the video was undisputed).  At this juncture, the Court does not find the surveillance video particularly helpful (or detrimental) to either party's position.  The Court has therefore not relied on the surveillance video in deciding this motion.

1.      Fleet Farm's Motion to Dismiss (ECF No. 22) is **GRANTED IN PART** and **DENIED IN PART**.   Count IV of Plaintiffs' complaint is **DISMISSED WITHOUT PREJUDICE**.

2.      Truck Yard's Motion to Dismiss (ECF No. 16) is **DENIED**.

Dated: September 9, 2025

*s/Laura M. Provinzino*
Laura M. Provinzino
United States District Judge