UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Beth Wiley and Kevin Wiley, Co-Trustees for the Next-of Kin of Marquisha Wiley, decedent, Chassity Ashford, Sherron Ashford, Wayne Germond, Nicholas Guerrero, Danielle Hernandez, Charisma Kyles, Jordan Larson, Keeshara Perry, Paris Pollard, Latosha Skinner, Estan Tyler, Andrea Weathersby, Ernest Whitmore, Kevaughn Wiley, Ian Wiersma, and Francis Wiersma.

Plaintiffs,

v.

Fleet Farm, LLC, Fleet Farm Group, LLC, Fleet Farm Wholesale Supply Co. LLC, and Truck Yard – SP LLC,

Defendants.

Case No.: 24-cv-4135 (LMP/JFD)

**FIRST AMENDED COMPLAINT**

For their First Amended Complaint[1] against Defendants FLEET FARM LLC (f/k/a Mills Fleet Farm LL), FLEET FARM GROUP, LLC (f/k/a Mills Fleet Farm Group LLC, and FLEET FARM WHOLESALE SUPPLY CO. LLC (f/k/a Fleet Wholesale Supply Co. LLC), and TRUCK YARD – SP LLC (d/b/a Seventh Street Truck Yard), Plaintiffs BETH WILEY and KEVIN WILEY, Co-Trustees for the Next-of Kin of MARQUISHA WILEY, decedent, CHASSITY ASHFORD, SHERRON ASHFORD, WAYNE GERMOND, NICHOLAS GUERRERO, DANIELLE HERNANDEZ, CHARISMA KYLES, JORDAN LARSON, KEESHARA PERRY, PARIS POLLARD, LATOSHA SKINNER, ESTAN

[1] Some of Plaintiffs' allegations against Fleet Farm Defendants are the same or similar to those asserted by the State of Minnesota in the matter before the United States District Court for the District of Minnesota, Case No. 22-cv-2694 (JRT/JFD).

TYLER, ANDREA WEATHERSBY, ERNEST WHITMORE, KEVAUGHN WILEY, IAN WIERSMA AND FRANCIS WIERSMA (collectively, "PLAINTIFFS") hereby state and allege upon knowledge, information, and belief as follows:

## PARTIES

1. Plaintiffs BETH WILEY and KEVIN WILEY were appointed as co-trustees for the present action against Defendants on March 29, 2022, by Ramsey County District Court Judge Sara Grewing (62-CV-22-499).

2. Plaintiffs BETH WILEY and KEVIN WILEY are the surviving parents of MARQUISHA WILEY, decedent, who died on October 10, 2021, as a result of the wrongful acts or omissions of Defendants, their employees, representatives, agents, and assigns; and that a cause of action therefore exists pursuant to Minn. Stat. § 573.02.

3. Plaintiff CHASSITY ASHFORD, at all times material hereto, was a resident of Hennepin County, Minnesota.

4. Plaintiff SHERRON ASHFORD, at all times material hereto, was a resident of Hennepin County, Minnesota.

5. Plaintiff WAYNE GERMOND, at all times material hereto, was a resident of Dakota County, Minnesota.

6. Plaintiff NICHOLAS GUERRERO, at all times material hereto, was a resident of Ramsey County, Minnesota.

7. Plaintiff DANIELLE HERNANDEZ, at all times material hereto, was a resident of Dakota County, Minnesota.

8. Plaintiff CHARISMA KYLES, at all times material hereto, was a

resident of Dakota County, Minnesota.

9. Plaintiff JORDAN LARSON, at all times material hereto, was a resident of Dakota County, Minnesota.

10. Plaintiff KEESHARA PERRY, at all times material hereto, was a resident of Ramsey County, Minnesota.

11. Plaintiff PARIS POLLARD, at all times material hereto, was a resident of Ramsey County, Minnesota.

12. Plaintiff LATOSHA SKINNER, at all times material hereto, was a resident of Ramsey County, Minnesota.

13. Plaintiff ESTAN TYLER, at all times material hereto, was a resident of Ramsey County, Minnesota.

14. Plaintiff ANDREA WEATHERSBY, at all times material hereto, was a resident of Ramsey County, Minnesota.

15. Plaintiff ERNEST WHITMORE, at all times material hereto, was a resident of Ramsey County, Minnesota.

16. Plaintiff KEVAUGHN WILEY, at all times material hereto, was a resident of Dakota County, Minnesota.

17. Plaintiff IAN WIERSMA, at all times material hereto, was a resident of Ramsey County, Minnesota.

18. Plaintiff FRANCIS WIERSMA, at all times material hereto, was a resident of Hennepin County, Minnesota.

19. Defendant FLEET FARM LLC is a foreign limited liability company,

organized and existing under the laws of Delaware, with a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117; that FLEET FARM LLC is wholly owned by Fleet Farm Group, LLC; that Fleet Farm Group, LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.—a public traded private equity and investment banking firm.

20. Defendant FLEET FARM GROUP, LLC is a foreign limited liability company with its principal place of business located in Appleton, Wisconsin; that FLEET FARM GROUP, LLC has a registered office of 1010 Dale Street North, St. Paul, Minnesota 55117; that FLEET FARM GROUP, LLC owns Fleet Farm LLC and holds itself out as the tenant at the property addresses of Fleet Farm stores in Brooklyn Park, Cambridge, Owatonna, Mankato, Hermantown, Blaine, Baxter, Willmar, Alexandria, Lakeville, Rochester, Oakdale, and Winona; and that FLEET FARM GROUP, LLC is wholly owned by Fleet Farm Guarantor LLC, which is wholly owned by Fleet Farm Intermediate Holdco LLC, which is majority owned, indirectly by one or more subsidiaries of KKR & Co. Inc.—a public traded private equity and investment banking firm.

21. Defendant FLEET FARM WHOLESALE SUPPLY CO. LLC is a foreign limited liability company with its principal place of business in Appleton, Wisconsin; that FLEET FARM WHOLESALE SUPPLY CO. LLC has a registered office address of 1010 Dale Street North, St. Paul, Minnesota 55117; and that FLEET FARM

WHOLESALE SUPPLY CO. LLC is the named holder of all of Fleet Farm's federal firearms licenses.

22. Defendants FLEET FARM LLC, FLEET FARM GROUP, LLC, and FLEET FARM WHOLESALE SUPPLY CO. are collectively referred to herein as "FLEET FARM."

23. Defendant TRUCK YARD – SP LLC, is a foreign limited liability company organized and existing under the laws of Nevada. At all times material hereto, TRUCK YARD – SP LLC owned, operated, managed, maintained, or controlled a bar known as Seventh Street Truck Yard, located at 214 7th Street West, St. Paul, Minnesota 55102.

24 Defendant TRUCK YARD – SP LLC is referred to herein as "TRUCK YARD."

25. At all times material hereto, TRUCK YARD was responsible and vicariously liable for the acts and omissions of its employees, agents, representatives, and/or servants, including but not limited to, any property management companies and security guard companies TRUCK YARD hired or retained to operate, maintain, control or manage Seventh Street Truck Yard, or provide security services within or outside of Seventh Street Truck Yard.

## FACTUAL ALLEGATIONS

### I. SEVENTH STREET TRUCK YARD SHOOTING

26. At all relevant times, TRUCK YARD operated a bar located along an area of West Seventh Street in downtown St. Paul known for its nightlife and high

foot-traffic.

27. TRUCK YARD served alcohol and played loud music into the morning hours, cultivating a "night club" like culture of late-night drinking.

28. The building in which TRUCK YARD operated has large garage-like doors that open the bar to the sidewalk of West Seventh Street, allowing large crowds to accumulate and move freely in and out of the bar.

29. On information and belief, TRUCK YARD advertised that there would be a DJ on site every Friday and Saturday night in the months of September and October of 2021.

30. On information and belief, in the weeks leading up to the subject incident, TRUCK YARD was regularly drawing large crowds on weekend evenings that poured out onto the street along West Seventh Street.

31. In the year preceding the gun fight that took place on October 9, 2021, TRUCK YARD had multiple calls for service to the Saint Paul Police Department for violent and criminal incidents at its location:

**Saint Paul Police Department**

Search Filter=> Date Range Column: ALL Data, Date Range Type: Exact From 4/1/2021 12:00:00 AM To 10/11/2021 11:59:00 PM
LocationFilter: SearchType: All,HouseNumber: From: 214,StreetSearchType: Street,StreetName: [7]

| ID | CN | CALLDATE | PRIMARYRMSOFFENSE | INCIDENTADDRESS | CITATIONADDRESS | CADADDRESS | PARTICIPANTADDRESS |
|---|---|---|---|---|---|---|---|
| 1 | 20206229 | 09/26/2020 11:58 | DRUGS-POSS OF METHAMPHETAMINE | | | 214 7 ST W | |
| 2 | 21054075 | 03/17/2021 18:42 | AGG ASSAULT-W/FIST,FEET,ETC | | | 214 7 ST W | |
| 3 | 21068411 | 04/03/2021 22:26 | DISTURBANCE-FIGHTS | | | 214 7 ST W | |
| 4 | 21078090 | 04/17/2021 21:21 | ASS-ASSIST FIRE/AMBULANCE | | | 214 7 ST W | |
| 5 | 21080933 | 04/22/2021 15:14 | ASS-ASSIST CITIZEN CALLS, ALL | | | 214 7 ST W | |
| 6 | 21091578 | 05/07/2021 19:38 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 7 | 21092439 | 05/08/2021 23:41 | OTHER ASSAULTS | | | 214 7 ST W | |
| 8 | 21092489 | 05/09/2021 00:42 | DISTURBANCE-DISTURBANCE CALLS | | | 214 7 ST W | |
| 9 | 21093669 | 05/10/2021 19:34 | TRAFFIC-STOP/ADVISE | | | 214 7 ST W | |
| 10 | 21097259 | 05/15/2021 00:07 | ASSAULT-OTHER ASSAULTS,ALL | | | 214 7 ST W | |
| 11 | 21101343 | 05/20/2021 17:25 | POLICE VISIT-PROACTIVE POLICE VISIT | | | 214 7 ST W | |
| 12 | 21114151 | 06/06/2021 01:01 | AGG ASSAULT-W/OTHER DANGEROUS WEAPONS | | | 214 7 ST W | |
| 13 | 21118762 | 06/11/2021 20:39 | DISTURBANCE-SUSPICIOUS PERSON, CAR, ACTIVITY | | | 214 7 ST W | |
| 14 | 21120030 | 06/13/2021 15:39 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 15 | 21141958 | 07/11/2021 19:03 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 16 | 21145808 | 07/16/2021 18:55 | INVESTIGATE-AND ALL OTHER | | | 214 7 ST W | |
| 17 | 21146622 | 07/17/2021 20:01 | HARASSMENT-PHONE CALLS | | | 214 7 ST W | |
| 18 | 21166551 | 08/12/2021 18:41 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 19 | 21166631 | 08/12/2021 21:09 | DISTURBANCE-SUSPICIOUS PERSON, CAR, ACTIVITY | | | 214 7 ST W | |
| 20 | 21168337 | 08/15/2021 00:02 | DISTURBANCE-FIGHTS | | | 214 7 ST W | |
| 21 | 21168607 | 08/15/2021 14:19 | AGG ASSAULT-W/KNIFE,CUTTING INSTRUMENT,ETC | 214 7 ST W ,ST PAUL | | 214 7 ST W | |
| 22 | 21169169 | 08/16/2021 11:56 | AGG ASSAULT-W/FIST,FEET,ETC | 214 7 ST W Apt S-9410 ,ST PAUL | | 214 7 ST W Apt S-9410 | |
| 23 | 21188864 | 09/09/2021 19:40 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 24 | 21188940 | 09/09/2021 22:23 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 25 | 21192974 | 09/15/2021 08:08 | ALARMS | | | 214 7 ST W | |
| 26 | 21195200 | 09/17/2021 23:47 | CRIMINAL DAMAGE TO PROPERTY | | | 214 7 ST W | |
| 27 | 21196476 | 09/19/2021 19:01 | ASSAULT-OTHER ASSAULTS,ALL | 214 7 ST W ,ST PAUL | | 214 7 ST W | |
| 28 | 21207086 | 10/2/2021 22:32 | ASS-ASSIST FIRE/AMBULANCE | | | 214 7 ST W | |
| 29 | 21207199 | 10/3/2021 2:32 | DISTURBANCE-DISORDERLY BOYS,GIRLS,PERSONS | | | 214 7 ST W | |
| 30 | 21207211 | 10/3/2021 2:51 | OTHER ASSAULTS | | | 214 7 ST W | |
| 31 | 21209113 | 10/5/2021 19:38 | ASSAULT-OTHER ASSAULTS,ALL | 214 7 ST W Apt 212 ,ST PAUL | | 202 7 ST W Apt 212 | |
| 32 | 21212281 | 10/10/2021 0:17 | DEATH-INVESTIGATION OF A DEATH | 214 7TH ST W ,ST PAUL | | 214 7 ST W | |
| 33 | 21814624 | 07/25/2021 16:17 | FRAUD-UNAUTHORIZED USE OF CREDIT CARD | | | 214 7 ST W | |
| 34 | 21816870 | 10/11/2021 16:36 | LOST MISS PROP-LOST/MISSING PROPERTY | 214 7 ST W ,SAINT PAUL | | 214 7 ST W | |
| 35 | 620907943811 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 36 | 620907944139 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 37 | 620907944348 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |
| 38 | 620907985914 | | TRAFFIC VIOLATION-OVERTIME METER | | 214 7 ST E ,ST. PAUL | | |

32. On the evening of October 8, 2021, the day before the gun fight at TRUCK YARD, Ramsey County Sherriff Bob Fletcher, during his "Live on Patrol #181" YouTube channel, made the following predictions regarding the crowd outside of TRUCK YARD:

- "We've never had any shots fired here. I hope we never do, but with this volume, at some point it's going to happen right? It's become a very popular place…"; and
- "They have no idea how fast things can go downhill. Let me make a prediction. I think they'll go downhill before winter. When I say that, I mean fired guns."

33. On October 9, 2021, TRUCK YARD neither posted a sign banning guns in their premises nor personally informed entrants that guns were prohibited in the premises and demanded compliance, despite having the opportunity to do so pursuant

to Minnesota law.[2]

34. On or about October 9, 2021, PLAINTIFFS were lawful invitees at Seventh Street Truck Yard.

35. At least two armed individuals, Devondre Trevon Phillips ("Phillips") and Terry Brown ("Brown"), were allowed to enter Seventh Street Truck Yard.

36. On October 9, 2021, into the morning of October 10, 2021, there was a disc jockey playing loud music and a very large crowd present in the TRUCK YARD bar for the event promoted by TRUCK YARD.

37. Shortly after midnight, gunfire was exchanged between Phillips and Brown. As a result of the gun fight, many patrons were struck by stray bullets, including Plaintiffs CHASSITY ASHFORD, SHERRON ASHFORD, NICHOLAS GUERRERO, CHARISMA KYLES, KEESHARA PERRY, LATOSHA SKINNER, PARIS POLLARD, ANDREA WEATHERSBY, ERNEST WHITMORE, IAN WIERSMA and MARQUISHA WILEY, thereby resulting in severe injuries and the death of MARQUISHA WILEY, and further, WAYNE GERMOND, DANIELLE HERNANDEZ, JORDAN LARSON, ESTAN TYLER, KEVAUGHN WILEY and FRANCIS WIERSMA, were within the zone of danger created by the negligence of

[2] Minn. Stat. §624.714 subd.17 creates the ability for private establishments to make a "reasonable request" that firearms not be brought into a privately owned establishment. A posted request must be "prominent" and "conspicuous" as defined under Minn. Stat. §624.714, subd. 17(b)(2-3) and must contain the following language pursuant to Minn. Stat. §624.714, subd. 17(b)(1)(i): "(IDENTITY OF OWNER OPERATOR) BANS GUNS IN THESE PREMISES." In the alternative, pursuant to Minn. Stat. §624.714, subd. 17(b)(1)(ii) "the requester or the requester's agent personally informs the person that guns are prohibited in the premises and demands compliance."

Defendants TRUCK YARD and FLEET FARM and from the shooting and chaos each now exhibit physical manifestations of emotional distress.

38. On February 9, 2023, Phillips was convicted in Ramsey County District Court on 8 counts of attempted second-degree murder for his part in the subject gun fight. On June 23, 2023, Phillips was sentenced to 346 months in prison.

39. On June 14, 2023, Brown was convicted in Ramsey County District Court of one count of intentional second-degree murder and four counts of attempted second-degree murder for his part in the subject gun fight. He was also convicted of being an ineligible person in possession of a firearm. On August 8, 2022, Brown was sentenced to 441 months in prison.

## II. AS LICENSED FEDERAL FIREARMS DEALERS, FLEET FARM STORES HAVE A DUTY UNDER FEDERAL AND MINNESOTA LAW TO PREVENT UNLAWFUL GUN PURCHASES.

40. FLEET FARM is a retail store chain that sells firearms and ammunition to the public. There are 17 FLEET FARM locations in Minnesota. As licensed firearm dealers, FLEET FARM stores are required to comply with federal and state firearms laws and regulations.

41. Federal laws and regulations regulate commercial sales of firearms. The federal Gun Control Act of 1968 (18 U.S.C. §§ 921—931) created a nationwide licensing scheme for firearm dealers. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is the federal agency charged with enforcing these dealer-license provisions. Under the federal Gun Control Act, persons wishing to engage in the manufacturing, importing, or dealing in firearms must first obtain a license and

become a federal firearms licensee ("FFL"), as FLEET FARM stores have done. A person is categorically prohibited from "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a federal firearms license. 18 U.S.C. §§ 922(a)(1), 923(a).

42. Federal firearms laws serve to prevent crime by keeping guns out of the hands of certain persons who have a heightened risk of misusing firearms, such as minors, persons with felony convictions, and domestic abusers. *See generally* 18 U.S.C. §§ 921 *et seq*. The Minnesota Gun Control Act similarly reflects this purpose by establishing categories of persons who are prohibited from possessing firearms (Minn. Stat. § 624.713) and requires purchasers to obtain a Minnesota permit—including a separate state-mandated background check—before purchasing a pistol or semiautomatic military-style assault weapon ("SAMSAW") from a firearms dealer (Minn. Stat. § 624.7131).

43. Congress designed federal law to achieve this aim by channeling firearms commerce through firearms dealers. Regulating the distribution of firearms is intended to prevent trafficking and reduce access to firearms by persons prohibited from possessing them. Gun dealers and manufactures are trained on how to spot traffickers and straw purchasers through multiple publications and programs sponsored by the ATF and the gun industry, including the "Don't Lie for the Other Guy" program, newsletters, reference guides, regulatory updates, and ATF seminars.

44. Before transferring a firearm to any person who is not a licensed dealer, all firearms dealers, including FLEET FARM, must conduct a background check,

examine the individual's identification, and record the transaction on a firearms transaction record ("ATF Form 4473"). *See* 18 U.S.C. § 922(t)(1), 27 C.F.R. §§ 478.102, 478.124(a).

45. Before completing a purchase of a firearm from all firearms dealers, including FLEET FARM, a buyer must fill out ATF Form 4473, which asks the following question with the following bolded warning:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the dealer cannot transfer the firearm(s) to you.**

This warning puts the buyer on notice: the buyer is prohibited from buying a firearm on someone else's behalf while falsely claiming the firearm is for the buyer—otherwise known as a straw purchase. On ATF Form 4473, the buyer must certify that their answers on the form are true, correct, and complete. The buyer violates federal law by filling out the form inaccurately.

46. Congress strengthened federal prohibitions on straw purchasing by passing the Bipartisan Safer Communities Act in June 2022, which explicitly criminalizes straw purchasing in which any person knowingly purchases, or conspires to purchase, a firearm at the request or demand of another person, knowing or having reasonable cause to believe that the other person ( or the ultimate end user) is ineligible to possess the firearm or intends to use the firearm to commit a felony, terrorism, or drug trafficking. *See* 18 U.S.C. § 932(b).

47. Minnesota law echoes this prohibition on straw purchasing. In 2015, the

Minnesota Gun Control Act was amended to include a new section explicitly criminalizing straw purchases:

> Any person who purchases or otherwise obtains a firearm on behalf of or for transfer to a person known to be ineligible to possesses or purchase a firearm pursuant to federal or state law is guilty of a gross misdemeanor.

Minn. Stat. § 624.7133; *see also* Minn. Stat. § 624.7132, subd. 15(a)(4) (providing that a person who "makes a false statement in order to become a transferee of a pistol or [SAMSAW] knowing or having reason to know the statement is false" is guilty of a gross misdemeanor).

48. Straw purchasers commonly falsely certify on ATF Form 4473 that they are purchasing firearms for themselves. In addition to the information provided by purchasers on the form, there are red flags that indicate a straw purchase to firearms dealers, including the following:

- Multiple firearm purchases in a single transaction or separate one-gun transactions in short periods of time, particularly of multiple firearms of similar make, model, and caliber;
- Multiple handgun purchases, particularly 9mm caliber handguns as there are the most frequently recovered crime guns;
- Purchasing firearms with cash;
- The buyer in accompanied to the store by others who leave before the transaction or do not purchase firearms themselves;
- The buyer uses phone calls, text messages, or other means to communicate with others about which firearms to purchase;
- The buyer does not keep the firearms in their residence for their own use; and
- A short "time to crime"—the time between the purchase of a firearm and

> the recovery of the firearm by police in connection with a crime. The ATF has noted that the recovery of a crime gun within three years of its initial purchase "is considered a short time-to-crime and a significant trafficking indicator" that "suggests illegal diversion or criminal intent associated with the retail purchase from the FFL."[3]

49. Firearms dealers, including FLEET FARM, can refuse to sell a firearm to any buyer for nearly any reason, and a firearms dealer is prohibited from completing the sale if the dealer knows or *has reason to know* the ATF Form 4473 is inaccurate. Firearms dealers must also certify on the form that it is their "belief that it is not unlawful [ ] to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A."

50. ATF Form 4473 makes clear that all firearms dealers must do more than simply run a background check. The notices and instructions on the form explain that "[t]he transferor/firearms dealer of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction." The form also explains that a gun dealer "must stop the transaction if there is reasonable cause to believe that the transferee/buyer is prohibited from receiving or possessing a firearm[.]" The form contains a clear admonition:

| |
|---|
| c, or d. **Warning:** Any person who transfers a firearm to any person he/she knows or has reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, 18 U.S.C. 922(d), even if the transferor/seller has complied with the Federal background check requirements. |

[3] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives* (July 2004) (quotations omitted), *available at* https://perma.cc/B6AH-3FG6.

51. The Bipartisan Safer Communities Act reinforces this restriction by further prohibiting the transfer of a firearm if the firearms dealer knows or has reasonable cause to believe the use, carrying, or possession of a firearm by the recipient would constitute a felony under federal law. *See* U.S.C. § 933(a)(1).

52. Similarly, Minnesota law creates potential criminal liability for firearms dealers that have reason to believe they are selling to a straw purchaser. Specifically, Minn. Stat. § 624.7132, subd. 15(a)(2) provides that a person is guilty of a gross misdemeanor if they transfer a pistol or SAMSAW weapon "to a person who has made a false statement in order to become a transferee, if the transferor knows or has reason to know the transferee has made the false statement."

53. Federal law regards the purchase of more than one handgun in a short period of time as a potential indication that the purchaser could be involved in trafficking. Therefore, to monitor and deter handgun trafficking, federal law requires a firearms dealer to report all transactions in which an unlicensed buyer purchases two or more handguns within five business days on ATF Form 3310.4. *See* 18 U.S.C. § 923(g)(3)(A);

27 C.F.R. § 478.126a. Firearms dealers must transmit one copy of Form 3310.4 to the ATF, send another copy to a local law enforcement official (Chief Local Law Enforcement Official or "CLEO") designated to receive the form, and then retain one copy of the ATF 3310.4 form and attach it to the ATF Form 4473 related to the firearms sale. *See* 18 U.S.C. § 923(g)(3)(A); 27 C.F.R. 478.126a.

54. Federal rules require all firearms dealers to keep a record of all

transactions with unlicensed persons in an acquisition and disposition book. 27 C.F.R. §§ 478.123(b), 478.125(e). A firearms dealer violates federal law by knowingly making false statements or misrepresentations, failing to make appropriate entries in, or failing to properly maintain, acquisition and disposition records, firearms transaction records, or reports of multiple sales of handguns. 18 U.S.C. §§ 922(m), 924(a)(3); *see also* 18 U.S.C. § 924(a)(1)(A).

55. Federal law also enlists dealers and manufacturers in working to detect illegal transactions and trafficking after a firearm is used unlawfully. When a law enforcement agency recovers a firearm at a crime scene or in the course of a criminal investigation, the agency may request a trace report from ATF's National Tracing Center. The ATF represents that "[f]irearms tracing is only conducted at the request of a law enforcement agency engaged in a bona fide criminal investigation where a firearm has been used or is suspected to have been used in a crime."[4] The National Tracing Center tracks the path of the firearm from its manufacturer through the distribution chain to the last retail sale transaction between a firearms dealer and purchaser. Because firearms dealers most provide information from their records about crime guns that the firearms dealers manufactured, distributed, or sold, *see* 18 U.S.C. § 923(g)(7); 27 C.F.R. § 478.25a, firearms dealers are on notice of which transactions, types of guns, and purchasers are potentially involved in criminal activity.

56. Firearms dealers are required to know the federal firearms laws and

[4] Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Trace Data – 2019*, https://perma.cc/P8P3-BGYS.

regulations. ATF agents review the applicable law and regulations with firearms dealers when they initially receive their license and during ATF audits. At the conclusion of an audit, the ATF requires firearms dealers to certify acknowledgment of federal laws and regulations. The acknowledgement form includes certification that the firearms dealer has reviewed laws and regulations regarding all of the following: (i) completing and maintaining firearm transaction records; (ii) conducting transfers between firearms dealers; (iii) engaging in the business of firearms dealing; and (iv) straw purchasing.

## III. FLEET FARM SOLD A FIREARM USED IN THE GUN FIGHT GIVING RISE TO THIS ACTION TO A STRAW PURCHASER AND KNEW OR SHOULD HAVE KNOWN IT WAS SELLING THAT FIREARM TO A STRAW PURCHASER.

57. Between the four-month span of mid-June 2021 and mid-October 2021, Fleet Farm sold 24 firearms to Jerome Horton ("Horton"). Horton resold several of the firearms he purchased to different people. The sales are identified in the chart below, with multiple firearm purchases on the same day highlighted:

| Store | Location | Straw Purchase Date | Firearm Make, Model, Caliber | Serial Number |
|---|---|---|---|---|
| Fleet Farm | Brooklyn Park | 6/15/2021 | Taurus G2C 9mm | 1C020445 |
| Fleet Farm | Brooklyn Park | 7/4/2021 | Ruger Security 9 9mm | 38463707 |
| Fleet Farm | Brooklyn Park | 7/7/2021 | Glock 19 9mm | BTNX619 |

| | | | | |
|---|---|---|---|---|
| Fleet Farm | Oakdale | 7/10/2021 | Glock G43X 9mm | BTTU573 |
| Fleet Farm | Blaine | 7/23/2021 | Beretta APX 9mm | A152030X |
| Fleet Farm | Oakdale | 7/24/2021 | FNH 503 9mm | CV016470 |
| Fleet Farm | Oakdale | 7/24/2021 | Springfield Armory XDS 9mm | BA456304 |
| Fleet Farm | Oakdale | 7/26/2021 | Glock 26 9mm | AFVB754 |
| Fleet Farm | Blaine | 7/27/2021 | Glock 43X 9mm | BTTU0778 |
| Fleet Farm | Blaine | 7/27/2021 | Stoeger STR-9C 9mm | T642921S02199 |
| Fleet Farm | Blaine | 7/31/2021 | Glock 45 9mm | BSTE309 |
| Fleet Farm | Blaine | 7/31/2021 | Mossberg MC2C 9mm | 107520MC |
| Fleet Farm | Blaine | 7/31/2021 | Ruger EC95 9mm | 45955269 |
| Fleet | Blaine | 8/14/2021 | Glock 19X 9mm | BUCB186 |

| | | | | |
|---|---|---|---|---|
| Farm | | | | |
| Fleet Farm | Brooklyn Park | 8/20/2021 | Glock G19 9mm | BSXE226 |
| Fleet Farm | Lakeville | 8/31/2021 | Glock 26 9mm | AFVC844 |
| Fleet Farm | Lakeville | 8/31/2021 | Mossberg MC2C 9mm | 014211MC |
| Fleet Farm | Blaine | 9/13/2021 | Glock G17 9mm | BUGR628 |
| Fleet Farm | Brooklyn Park | 9/17/2021 | Ruger 57 5.7x28 | 64322362 |
| Fleet Farm | Blaine | 9/18/2021 | Glock G19 9mm | BUAS957 |
| Fleet Farm | Blaine | 9/26/2021 | Glock 26 9mm | AFSE457 |
| Fleet Farm | Blaine | 9/26/2021 | Radical Firearms RF-15 .556 | 21046140 |
| Fleet Farm | Brooklyn Park | 10/11/2021 | Taurus G3C 9mm | 1KA06796 |
| Fleet Farm | Oakdale | 10/17/2021 | Glock 26 9mm | AGBR071 |

58. As shown in the chart above, Fleet Farm sold Horton multiple guns as part of the same transaction—typically handguns of the same caliber—on five different days. Between July 24, and July 31, 2021, a one-week timespan, Fleet Farm sold Horton eight 9mm semiautomatic pistols.

59. The sheer volume of Horton's purchases put Fleet Farm on notice he was not making bona fide purchases for himself but was instead straw purchasing firearms for others.

60. Horton's purchases were also highly suspicious considering that on five occasions, Fleet Farm sold Horton multiple handguns as part of the same transaction, and Fleet Farm made multiple sales to Horton at the same location within five business days on several occasions. These sales required Fleet Farm to submit additional paperwork to ATF because such conduct is an indicator of unlawful gun trafficking. Moreover, the firearms purchased were also nearly all the same caliber (9mm) of handgun—another red flag of straw purchasing. Horton also staggered purchasing single handguns within days or weeks of each other and from different Fleet Farm locations.

61. Furthermore, the affidavit in support of the federal charges against Horton indicate that the ATF reviewed Fleet Farm surveillance video showing Horton "using the camera feature on his [phone] to either take photographs or video" in connection with Horton's October 17, 2021, purchase of a Glock 26 9mm handgun at Fleet Farm's Oakdale store. Affidavit of Special Agent Kylie Williamson at ¶ 14, Dkt. No. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021). The ATF

agent testified that in her training and experience, this is a common indication of straw purchasing, as the straw purchaser wants to show available firearms to the third party intended recipient of the firearm without the intended recipient having to appear on surveillance cameras. *Id.*

62. Hortons' highly suspicious behaviors put Fleet Farm on notice that Horton was engaged in straw purchasing and unlawful trafficking of firearms, and that he was attempting to evade detection by authorities. Nevertheless, Fleet Farm continued to sell guns to Horton anyway.

63. After Fleet Farm sold guns to Horton, Horton trafficked these guns to criminals and prohibited persons. Specifically, Horton transferred six of these handguns to Gabriel Young-Duncan, who would then keep the firearms or further transfer them to other persons. *See* Indictment, Dkt. No. 1, *U.S. v. Gabriel Lee Young-Duncan*, Case No. 22-CR-00004 (D. Minn. Jan. 18, 2022). Young-Duncan was charged on January 18, 2022, and ultimately pleaded guilty in federal court to conspiracy to make false statements in the purchase of a firearm for his participation in Horton's straw purchasing scheme. *See id.*

64. The guns Fleet Farm sold to Horton have caused harm to Plaintiffs. On October 10, 2021, the Mossberg MC2C 9mm semiautomatic pistol that Fleet Farm sold to Horton on July 31, 2021, serial number 017520MC—which Horton then transferred to Young-Duncan—was fired at the Truck Yard gun fight giving rise to this action. The pistol was fired by Phillips, who had a prior felony conviction for aggravated first-degree robbery, which makes him ineligible to possess firearms or

ammunition. Affidavit of Special Agent Kylie Williamson, Dkt. 1-1, *U.S. v. Horton*, Case No. 22-CR-00006 (D. Minn. Oct. 18, 2021); see also Amended Complaint, *State v. Devondre Trevon Phillips*, No. 62-CR-21-5805 (Ramsey Cty. Dist. Ct. May 26, 2022). Phillips fired the pistol in the Truck Yard gun fight, which included one other gunman, Brown. As bystanders to the gun fight, PLAINTIFFS were severely injured, and MARQUISHA WILEY was killed when a bullet penetrated her left lung and heart.

65. On May 25, 2022, Young-Duncan pleaded guilty in U.S. District Court, District of Minnesota, to conspiring to make false statements to buy guns and on October 5, 2022, he was sentenced to 40 months in prison, to be followed by three years of supervised release, for his part in the straw purchase scheme.

66. In March 2022, Horton pleaded guilty in U.S. District Court, District of Minnesota, to one count of false statements in the purchase of firearms and on October 25, 2022, Horton was sentenced to 25 months in prison for his part in the straw purchase scheme.

67. By engaging in the sale and transfer of firearms to Horton under the circumstances described above, Fleet Farm knowingly violated, and/or aided and abetted Horton in the violation of numerous laws and regulations, including 18 U.S.C. § 922(a)(1) (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 922(a)(6) (knowingly making a false statement in connection with the acquisition of a firearm); 18 U.S.C. § 922(m) (knowingly making false entries in records required to be kept by dealer); 18 U.S.C. §923(a) (engaging in the business of

dealing firearms without a license); 18 U.S.C. § 924(a)(1)(A) (knowingly making a false statement or representation concerning information to be kept in the records of an FFL); 18 U.S.C. § 924(a)(1)(D) (willfully violating the federal Gun Control Act); 18 U.S.C. § 924(a)(3) (licensee knowingly making a false statement or representation concerning information to be kept in records of an FFL); 27 C.F.R. 478.21(a) (failing to ensure completion of forms in accordance with form instructions); 27 C.F.R. 478.124(c)(1) and (c)(5) (failing to ensure accurate completion of ATF Form 4473 before the transfer of a firearm); Minn. Stat. § 624.7132, subd. 15(a)(2) (transferring a pistol or SAMSAW to a person the transferor knows or has reason to know has made a false statement in order to become a transferee); Minn. Stat. § 624.7132, subd. 15(a)(4) (making a false statement in order to become a transferee of a pistol or SAMSAW knowing or having reason to know the statement is false); and Minn. Stat. § 624.7133 (purchasing or obtaining a firearm on behalf of or for transfer to an ineligible person).

**COUNT I: NEGLIGENCE AGAINST TRUCK YARD**

68. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 69 as though set forth herein and further state:

69. At all material times, TRUCK YARD owed a duty to the invitees of Seventh Street Truck Yard to exercise reasonable and ordinary care to keep and maintain Seventh Street Truck Yard and its common areas in a reasonably safe condition.

70. At all material times, TRUCK YARD knew, or in the exercise of

reasonable care should have known, of the likelihood that an individual would attempt to enter Seventh Street Truck Yard carrying a weapon or firearm, and that based on the nature of Seventh Street Truck Yard's business, shootings, assaults, attacks, altercations and/or other crimes were likely to occur.

71. Moreover, at all material times, TRUCK YARD knew, or in the exercise of reasonable care should have known, that prior to the date of the subject incident, other violent and non-violent criminal acts including but not limited to, shootings, assaults, attacks, and/or altercations had or were reasonably likely to be perpetrated on invitees to Seventh Street Truck Yard unless TRUCK YARD took steps to provide proper security for such individuals.

72. Based on the foregoing, the risk of harm to PLAINTIFFS, which did occur, was foreseeable.

**NEGLIGENT PERFORMANCE OF AN ASSUMED DUTY**

73. At all relevant times, TRUCK YARD undertook a duty to provide security on the premises.

74. In undertaking the duty to provide security, TRUCK YARD was obligated to perform that duty with reasonable care.

75. Given the foreseeable risk of gun violence to its patrons, TRUCK YARD owed a duty to take reasonable steps to deter violent crime, including gun violence on its premises.

76. TRUCK YARD breached its duty to exercise reasonable care for the safety and protection of invitees of the subject premises, including PLAINTIFFS, and

acted in a careless and negligent manner through the following acts or omissions:

a. Failing to provide adequate security for invitees and the public;

b. Failing to warn invitees and the public of the nature and character of its premises when it knew or in the exercise of reasonable care should have known that other criminal incidents had occurred on the subject premises and areas adjacent thereto prior to the date of the subject incident;

c. Failing to have adequate procedures governing the search and inspection of patrons prior to entry into Seventh Street Truck Yard or, alternatively, having procedures governing the search and inspection of patrons prior to entry into Seventh Street Truck Yard and failing to implement them and/or implementing them in a careless and negligent manner.

d. Failing to police, patrol, guard, deter, and otherwise provide adequate protection for invitees and the public;

e. Failing to hire or retain adequate security personnel to patrol and/or monitor the premises;

f. Failing to have a sufficient number of security personnel in visible areas to deter crime and protect invitees and the public;

g. Failing to hire and/or retain competent security personnel to protect invitees and the public;

h. Failing to properly train security personnel to be reasonably skillful, competent, and/or qualified to exercise appropriate and proper security measures so they could protect invitees and the public;

i. Failing to implement adequate security policies, security measures, and security procedures necessary to protect invitees and the public;

j. Failing to adequately provide an overall security plan that would meet the known industry standards and customs for safety within the subject premises and its common areas; and

k. Failing to ban guns on its premises pursuant to Minn. Stat. §624.714, subd. 17.

77. That PLAINTIFFS as patrons of TRUCK YARD were foreseeable victims of the risk of gun violence on its premises.

78. That such negligent and other fault conduct by TRUCK YARD directly caused injuries and damages to PLAINTIFFS.

79. As a direct and proximate result of TRUCK YARD's negligence, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

**TRUCK YARD'S OWN CONDUCT CREATED FORESEEABLE RISK**

80. TRUCK YARD promoted events resulting in increasingly large crowds that its staff and security could not manage.

81. TRUCK YARD invited and allowed patrons to carry weapons on its premises.

82. As evidenced by the prior police calls to the premises and the statements of the Ramsey County Sheriff just the day before the incident, gun violence occurring

at TRUCK YARD was a foreseeable risk.

83. Through its own conduct, TRUCK YARD created or expanded the risk of gun violence at its bar.

84. That PLAINTIFFS as patrons of TRUCK YARD were foreseeable victims of the risk of gun violence at TRUCK YARD.

85. That such negligent and other fault conduct by TRUCK YARD directly caused injuries and damages to PLAINTIFFS.

86. As a direct and proximate result of TRUCK YARD's negligence, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and suffered emotional distress, and death as to MARQUISHA WILEY.

**COUNT II: NEGLIENCE AGAINST FLEET FARM**

87. Plaintiffs hereby incorporate and re-allege paragraphs 1 through 91 as though set forth herein and further state:

88. At all times materials hereto, FLEET FARM owed PLAINTIFFS the general duty imposed on all persons and entities to not expose others to reasonably foreseeable risks of injury. FLEET FARM had a duty to exercise reasonable care in distributing and selling firearms and to refrain from engaging in activity creating reasonably foreseeable risks of injury to others. A breach of said duty constitutes negligence.

89. FLEET FARM failed to exercise reasonable care and breached their duty to PLAINTIFFS by selling firearms they knew or should have known were

destined for the illegal stream of commerce and into the hands of persons ineligible to possess a firearm, such as Phillips. FLEET FARM's failure to abide by their duty to exercise such reasonable harm increased the risk of harm, including the risks of prohibited firearm possession, firearm injuries, and death.

90. FLEET FARM engaged in the business of selling firearms to straw purchasers and traffickers, including Horton, even though FLEET FARM knew, or consciously avoided knowing, Horton was engaged in unlicensed dealing, firearms trafficking, and/or straw purchasing.

91. FLEET FARM further breached its duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, numerous federal laws and regulations, including 18 U.S.C. §§ 922(a)(1), 922(a)(6), 922(m), 923(a), 924(a)(1)(A), and 924(a)(1)(D), 924(a)(3), and 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5).

92. FLEET FARM further breached its duty by engaging in conduct that knowingly violated, and aided and abetted the violation of, Minnesota law, including Minn. Stat. §§ 624.7132, subds. 15(a)(2) and 15(a)(4), and 624.7133.

93. FLEET FARM is vicariously liable for the actions or inactions of its employees and/or agents while in the scope of their employment and/or agency.

94. As a direct and proximate result of FLEET FARM's negligent conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and suffered emotional distress, and death as to MARQUISHA WILEY.

## COUNT III: NEGLIGENCE PER SE AGAINST FLEET FARM

95. PLAINTIFFS hereby incorporate and re-allege paragraphs 1 through 99 as though set forth herein and further states:

96. Under the law, and due to FLEET FARM's responsibilities as a federally licensed dealer of an especially dangerous product, FLEET FARM owed a duty of care to PLAINTIFFS. These laws include, but are not limited to, the provisions of the federal Gun Control Act (18 U.S.C. §§ 921-931) and its implementing regulations (27 C.F.R. Part 478), and the Minnesota Gun Control Act (Minn. Stat. §§ 624.71-624.7192).

97. The above laws and regulations are intended to curb firearm crime, prevent access to firearms by persons prohibited from possessing them, and protect public safety. These laws and regulations were designed to prevent illegal dealing in firearms by directing firearms commerce through businesses licensed by the federal government. These laws and regulations impose obligations on licensed dealers to further their purpose.

98. PLAINTIFFS are within the class of persons meant to be protected by these laws and regulations, and the injuries to the PLAINTIFFS are of the nature that these laws and regulations were designed to prevent.

99. Through the conduct described herein, FLEET FARM has violated and aided and abetted the violation of the laws and regulations referenced above, including 18 U.S.C. §§ 922(a)(1), 922(a)(6), 924(a)(1)(a), and 924(a)(1)(D), 27 C.F.R. §§ 478.21(a), 478.124(c)(1), and 478.124(c)(5), and Minn. Stat. §§ 624.7132, subd.

15(a)(4), and 624.7133. In doing so, FLEET FARM has breached its duty of care to PLAINTIFFS. Therefore, FLEET FARM's breach of the laws and regulations referenced above constitutes negligence per se for which FLEET FARM is liable.

100. FLEET FARM is vicariously liable for the actions or inactions of its agents and/or employees while they are acting in the scope of their agency and/or employment.

101. As a direct and proximate result of FLEET FARM's negligent and unlawful conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

**COUNT IV: NEGLIGENT ENTRUSTMENT AGAINST FLEET FARM**

102. PLAINTIFFS hereby incorporate and re-allege paragraphs 1 through 106 as though set forth herein and further state:

103. At the time that FLEET FARM made the firearms sale to Horton, FLEET FARM knew or reasonably should have known that Horton was engaged in unlawful straw purchasing or unlicensed dealings in firearms to prohibited persons or for use in the commission of crimes.

104. FLEET FARM knew or reasonably should have known that Horton's straw purchasing and/or unlicensed dealing in firearms created an unreasonable risk of harm to third parties, including PLAINTIFFS, because a foreseeable and likely consequence of those unlawful trafficking activities is gun violence resulting in serious injury or death.

105. FLEET FARM had possession and control of the firearms that FLEET FARM transferred or caused to be transferred to straw purchaser Horton. FLEET FARM knew or should have known that its employees or agents who transferred firearms or caused firearms to be transferred to Horton were obliged to use their judgment to refuse to transfer firearms to a transferee (Horton) whom the employees and agents knew or should have known was involved in straw purchasing and/or unlicensed dealing in firearms.

106. FLEET FARM, by their employees and agents, knew or should have known that firearms transferred to traffickers and straw purchasers would likely be used in a manner involving an unreasonable risk of harm.

107. A firearm negligently entrusted by FLEET FARM to Horton has foreseeably been recovered in the possession of a prohibited possessor (PHILLIPS) and been determined to have been used in the commission of crimes at TRUCK YARD on October 10, 2021.

108. FLEET FARM is vicariously liable for the actions or inactions of its agents and/or employees while acting in the scope of their agency and/or employment.

109. As a direct and proximate result of FLEET FARM's conduct described herein, PLAINTIFFS suffered personal bodily injuries resulting in pain and suffering, disability, disfigurement, other economic damages, and death as to MARQUISHA WILEY.

WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $50,000.00, including statutory interest accrued, for an award of their costs and disbursements, and for such other and further relief the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

**TEWKSBURY & KERFELD, P.A.**

Date: December 22, 2025

By: *<u>/s/ Peter Lind</u>*
Peter Lind (#0063368)
Zachary R. Zellner (#0402292)
Eric C. Arch (#0401765)
88 South Tenth Street, Suite 300
Minneapolis, MN 55403
(612) 334-3399
plind@tkz.com
zzellner@tkz.com
earch@tkz.com
*Attorney for Plaintiffs*

**HEINLEIN LAW**

Date: December 22, 2025

By: *<u>/s/ Melissa M. Heinlein</u>*
Melissa M. Heinlein (#0393119)
Priscilla A. Lord (#0123754)
309 Clifton Avenue
Minneapolis, MN 55403
(612) 333-5673
melissa@mnlordlaw.com
priscilla@mnlordlaw.com
*Attorney for Plaintiffs*

**TSR INJURY LAW**

Date: December 22, 2025

By: *<u>/s/ Nathan H. Bjerke</u>*
Nathan H. Bjerke (#026670X)
Lyndsey R. Jorgenson (#0395456)
8300 Norman Center Drive, # 1275
Bloomington, MN 55437
(952-832-5800
Nate@TSRInjurylaw.com
Lyndsey@TSRInjuryLaw.cpm
*Attorney for Plaintiffs*